# 12-4310-cr(L),
## 12-4365-cr(CON), 12-4371-cr(CON)

# United States Court of Appeals

*for the*

# Second Circuit

⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

UNITED STATES OF AMERICA,

*Appellee,*

– v. –

PETER S. GRIMM, DOMINICK P. CAROLLO, STEVEN E. GOLDBERG,

*Defendants-Appellants,*

– and –

UBS AG, UBS SECURITIES LLC, UBS FINANCIAL SERVICES, INC.,

*Intervenors.*

⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## PAGE PROOF BRIEF FOR DEFENDANT-APPELLANT
## DOMINICK P. CAROLLO

JAMES R. SMART
MCELROY, DEUTSCH, MULVANEY
  & CARPENTER, LLP
30 Jelliff Lane
Southport, Connecticut 06890
(203) 319-4000

WALTER F. TIMPONE
MCELROY, DEUTSCH, MULVANEY
  & CARPENTER, LLP
1300 Mount Kemble Avenue
Morristown, New Jersey 07962
(973) 993-8100

*Attorneys for Defendant-Appellant Dominick P. Carollo*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................. iii

PRELIMINARY STATEMENT ............................................................1

JURISDICTION..................................................................................2

STATEMENT OF THE ISSUES ON APPEAL ......................................3

NATURE OF THE CASE AND COURSE OF THE PROCEEDINGS .................4

SUMMARY OF THE RELEVANT FACTS AND PROCEEDINGS .....................6

    A.    Relevant Facts Regarding Carollo's Departure from GE and Competition Against His Former Employer .................6

    B.    Relevant Proceedings .........................................................11

        1.    The Charged Conspiracies .......................................11

        2.    The Testimony of Adrian Scott-Jones and Related Rulings ...........................................................13

        3.    The Post-Trial Motions .............................................15

SUMMARY OF ARGUMENT ...........................................................16

ARGUMENT ...................................................................................20

    I.    THE DISTRICT COURT ERRED IN NOT GRANTING ACQUITTAL AS A MATER OF LAW BECAUSE THE CHARGES WERE BARRED BY THE STATUTE OF LIMITATIONS ...................................................................20

    II.    THE DISTRICT COURT ERRED IN NOT GRANTING ACQUITTAL AS A MATER OF LAW BASED ON DEFENDANT CAROLLO'S WITHDRAWAL DEFENSE. ...............................................................21

        A.    Standard of Review.................................................21

B.  The Undisputed Evidence Established as a Matter of Law that He Withdrew from the Charged Conspiracies Before July 27, 2004 ...........................................22

III.  THE DISTRICT COURT ERRED IN DENYING CAROLLO'S MOTION FOR A MISTRIAL IN LIGHT OF THE INCURABLE PREJUDICE POSED BY SCOTT-JONES' ABORTED TESTIMONY ....................................32

A.  Standard of Review.................................................................33

B.  Scott-Jones' Testimony Unduly and Irredeemably Prejudiced Carollo.......................................................33

C.  The Trial Court's Remedial Measures Were Inadequate ............................................................................41

CONCLUSION .........................................................................................49

CERTIFICATE OF COMPLIANCE .......................................................50

# TABLE OF AUTHORITIES

Page

## CASES

*Brinson v. Walker*, 547 F.3d 387 (2d Cir. 2008) ...................................................39

*Cotto v. Herbert*, 331 F.3d 217 (2d. Cir. 2003) ...................................................38

*Davis v. Alaska*, 415 U.S. 308 (1974) ...................................................38

*Dunbar v. Harris*, 612 F.2d 690 (2d Cir.1979) ...................................................39

*Greene v. McElroy*, 360 U.S. 474 (1959) ...................................................39

*Kentucky v. Stincer*, 482 U.S. 730 (1987) ...................................................39

*Radiation Dyn., Inc. v. Goldmuntz*, 464 F.2d 876 (2d Cir. 1972) ........................22

*Smith v. United States*, 568 U.S. __, No. 11-8976 (Jan. 9, 2013) ..........................23

*United States v. Berger*, 224 F.3d 107 (2d Cir. 2000) ...................................24, 28

*United States v. Borelli*, 336 F.2d 376 (2d Cir. 1964) ...........................................24

*United States v. Cardillo*, 316 F.2d 606 (2d Cir. 1963) .........................................39

*United States v. Carneglia*, 403 Fed. Appx. 581,
2010 WL 5129122 (2d Cir., Dec. 17, 2010) ...................................................23, 27

*United States v. Celaj*, 649 F.3d 162 (2d Cir. 2011) ...........................................21

*United States v. Coplan*, 703 F.3d 46 (2d Cir. 2012) ...........................................21

*United States v. D'Amato*, 39 F.3d 1249 (2d Cir. 1994) ..................................21, 22

*United States v. DeDominicis*, 332 F.2d 207 (2d Cir. 1964) ................................42

*United States v. Geaney*, 417 F.2d 1116 (2d Cir. 1969) ........................................42

*United States v. Goldberg*, 401 F.2d 644 (2d Cir. 1968) ...........................22, 23, 27

*United States v. Gomez*, 617 F.3d 88 (2d Cir. 2010) ...............................................42

*United States v. Greenfield*, 44 F.3d 1141 (2d Cir. 1995) ...............................24, 29

*United States v. Grunewald*, 353 U.S. 391 (1957) ...........................................20, 30

*United States v. Klein*, 582 F.2d 186 (2d Cir. 1978) .........................................22, 33

*United States v. LaMorte*, 950 F.2d 80 (2d Cir. 1991) .....................................23, 29

*United States v. Malsom*, 779 F.2d 1228 (7th Cir. 1985) ......................................39

*United States v. Nelson*, 277 F.3d 164 (2d Cir. 2002) ...........................................22

*United States v. Perez*, 22 U.S. 579 (1824) ...........................................................33

*United States v. Rodriguez*, 587 F.3d 573 (2d Cir. 2009) .......................................33

*United States v. Roshko*, 969 F.2d 1 (2d Cir. 1992) ...............................................30

*United States v. Salerno*, 868 F.2d 524 (2d Cir. 1989) ...........................................22

*United States v. Salmonese*, 352 F.3d 608 (2d Cir. 2003) ......................................30

*United States v. Sepulveda*, 15 F.3d 1161 (1st Cir. 1993) ...............................42, 46

*United States v. United States Gypsum Co.*, 438 U.S. 422 (1978) .............23, 27, 28

*United States v. Yannotti*, 541 F.3d 112 (2d Cir. 2008) .........................................21

*United States. v. Lyons*, 703 F.2d 815 (5th Cir. 1983) ......................................39, 43

## CONSTITUTION, STATUTES, AND RULES

U.S. Const. amend. X.................................................................................43

U.S. Const. amend. XI ...........................................................................38

18 U.S.C. § 371....................................................................................4, 11

18 U.S.C. § 1343..................................................................................4, 11

18 U.S.C. § 3231.......................................................................................2

18 U.S.C. § 3282(a) ..............................................................................23

26 U.S.C. § 6531(1) ..............................................................................23

28 U.S.C. § 1291.......................................................................................3

Fed. R. App. P. 4(b)(1)(A) .....................................................................3

Fed. R. App. P. 28(i) .......................................................................20, 33

Fed. R. Crim. P. 29(a) ...........................................................................21

Fed. R. Crim. P. 29(c) ...........................................................................21

## PRELIMINARY STATEMENT

Defendant-Appellant Dominick Carollo's convictions should be reversed for at least three main reasons.

First, it is undisputed that the alleged fraudulent bidding activity at the heart of this case all occurred outside the limitations period. Although the government attempts to salvage its untimely indictment through an unprecedented theory that would give it the ability to bring this case into the 2030's, that theory vitiates the purpose of statutes of limitations and fails as a matter of law.

Second, Carollo also withdrew from the alleged conspiracies outside the limitations period. The government alleged that Carollo participated in a conspiracy whose object was to win municipal investment contracts through bid manipulation, for the benefit of his former employer, a subunit of GE Capital ("GE"). The evidence established beyond dispute, however, that Carollo stopped working for GE and formed a competing entity outside the limitations period. By so doing, Carollo withdrew as a matter of law because he stopped working toward the goals of the charged conspiracies and took affirmative actions that were inconsistent with the conspiracies' objects; namely he tried to stop GE from winning bids at low prices by competing against it, in a manner that was well known to his erstwhile alleged co-conspirators.

Finally, Carollo's convictions should be reversed due to the unfair prejudice caused by the disappearance from the trial of the government's key cooperating witness against him, before Carollo had an opportunity for cross-examination. After days of devastating (and false) testimony directed largely at Carollo, the witness left the court and attempted to take his own life shortly before Carollo's cross examination was to begin. The trial court's belated attempt to mitigate the prejudice from the jury's exposure to the witness' perjured and aborted testimony was dismally inadequate. The court did not even instruct the jury to disregard his testimony until almost four days after his disappearance, and only did so after instructing the jurors that they *would* be able to consider it. Moreover, the court never instructed the jury to disregard the scores of recordings and other exhibits that the government had introduced through the witness, inexcusably denying Carollo's request that it do so. The result was an irredeemably tainted verdict that must be overturned.

## **JURISDICTION**

The district court (Baer, J.) had subject matter jurisdiction in this criminal case under 18 U.S.C. § 3231. Following his conviction, Defendant-Appellant Dominick Carollo was sentenced and final judgment entered on October 25, 2012. Appendix ("A") __ (Judgment). The defendant filed a timely notice of appeal on

October 26, 2012, pursuant to Fed. R. App. P. 4(b)(1)(A).  A__ (Notice of Appeal).

This Court has appellate jurisdiction pursuant to 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES ON APPEAL

1.     Where the alleged object of the charged conspiracies was to win investment agreements through fraudulent bidding activity, but the evidence indisputably established that no such alleged bidding activity occurred within the limitations period, did the district court err in denying defendants' motion for acquittal based upon the routine, periodic interest payments on those investment agreements for decades beyond the last allegedly fraudulent bid?  Alternatively, is a new trial required due to the district court's failure to give the jury proper guidance on the legal requirements for an act  in furtherance of an ongoing conspiracy, for purposes of analyzing a statute of limitations defense?

2.     Did the district court err in denying Mr. Carollo's motion for judgment of acquittal where the undisputed evidence demonstrated as a matter of law that Mr. Carollo had withdrawn from the charged conspiracies outside the limitations period by separating from the employment of the company that the conspiracies aimed to benefit and directly competing against that company in a manner that was communicated to his erstwhile co-conspirators?

3.     Did the district court abuse its discretion by denying defendants' request to declare a mistrial after the government's key cooperating witness

3

committed perjury and then, after nearly four days of often devastating testimony, disappeared without giving Mr. Carollo and co-defendant Grimm an opportunity for cross-examination?

## NATURE OF THE CASE AND COURSE OF THE PROCEEDINGS

On July 27, 2010, a federal grand jury sitting in the Southern District of New York returned a twelve-count indictment against Mr. Carollo, along with codefendants Steven Goldberg and Peter Grimm.  A__ (Indictment).  On May 31, 2011, a superseding indictment against the same individuals was filed, which charged Carollo with three counts of conspiracy, in violation of 18 U.S.C. § 371 (Counts One-Three), and one count of wire fraud, in violation of 18 U.S.C. § 1343 (Count Seven).  A__ (Superseding Indictment).

On July 1, 2011, Carollo joined in a joint motion to dismiss the superseding indictment as time-barred; Carollo also raised his withdrawal from the conspiracy in support of his request for dismissal on statute of limitations grounds.  A __(Letter from W. Timpone to J. Baer dated Aug. 8, 2011).  On August 25, 2011, the district court dismissed Count Seven on the basis of the statute of limitations, but denied defendants' joint motion with respect to the other counts.  A__ (Aug. 25, 2011 Ruling).

Trial began on April 16, 2012.  A__(Docket).  After nearly four days of testimony and cross examination by Mr. Goldberg's counsel (longer than any other

witness), during the lunch break on April 27, cooperating witness Scott-Jones left the courthouse and attempted to take his own life, rendering him incapable of completing his testimony.  Tr. 2254-55, 2304, 2310-13.  The defense moved orally for a mistrial or, in the alternative, dismissal of Count Three, Tr. 2254-55, and repeated that request in writing.  A__, __, __ (Letter from W. Timpone to J. Baer dated April 30, 2012; Letter from J. Siffert to J. Baer dated April 29, 2012; Letter from H. Heiss to J. Baer dated April 29, 2012).  The district court denied both mistrial applications, Tr. 2255, and Tr. 2545.  Having earlier told the jury it would be permitted to consider Scott-Jones' incomplete testimony, Tr. 2316, the trial court reversed course and, on May 1, 2012, struck that testimony.  Tr. 2693.  Then the following day, outside of the presence of the jury, the court dismissed Count Three and struck the recordings and exhibits about which Mr. Scott-Jones testified.  Tr. 2699-2702.  The trial court declined defendants' request to inform the jury that it should not consider Scott-Jones' recordings and exhibits.  Tr. 3200; A__ (Letter from J. Smart to J. Baer dated May 7, 2012).  The jury was instead given no guidance on how to handle these materials.

The parties offered closing arguments on May 7, 2012.  Tr. 2976-3192.  The district court instructed the jury on May 8.  Tr. 3203-3244.  The jury deliberated for four days, Tr. 3249-3312, and on May 11, 2012, it returned a verdict, finding Carollo guilty on Counts One and Two.  Tr. 3313.

The defendants filed post-trial motions for acquittal on July 13, 2012, pursuant to the scheduling order. A__ (Endorsement dated June 11, 2012). On October 18, 2012, the district court orally denied the defendants' motions for acquittal at the start of defendants' sentencing hearing. A __ (Minute Order dated Oct. 26, 2012); Sentencing Tr. 10/18/12 at 10-11.

The district court sentenced Carollo to 36 months imprisonment, followed by a two-year term of supervised release. A__ (Judgment), Tr. 10/18/12 at 70-71. The court imposed this penalty on both Count One and Count Two, ordering that the penalty on each count be served concurrently. *Id.* The district court also imposed a fine of $50,000. *Id.* The court deferred decision regarding the issue of restitution for 90 days. Sentencing Tr. 10/18/12 at 58, 64, 69-70.

Judgment against Carollo was entered October 25, 2012. A__(Judgment). The defendant filed a timely notice of appeal on October 26, 2012. A__(Notice of Appeal).

Appellant Carollo is currently serving the prison sentence imposed by the district court.

## SUMMARY OF THE RELEVANT FACTS AND PROCEEDINGS

### A.    Relevant Facts Regarding Carollo's Departure from GE and Competition Against His Former Employer.

From approximately 1993 until November 2002, Dominick Carollo worked for FGIC Capital Market Services, Inc. and related entities owned and managed by

GE Capital ("GE"). A __, __ (Superseding Indictment ¶ 3). During part of this period he worked as a manager in GE's municipal investment contract business, as alleged by the Superseding Indictment. *Id.*

By way of background, municipalities often sell tax-exempt bonds to raise money for, among other things, public works projects. As part of the bond issuance process, a municipality will receive a lump sum of money that it will use over a period of time to pay for the project costs. To receive a return on the portion of the proceeds not immediately needed, municipalities often hire a broker to solicit bids for a guaranteed investment contract ("GIC"). Brokers will then solicit bids from investment grade financial institutions that, in exchange for receipt of the unused bond proceeds, will pay the municipality a rate of return on the bond proceeds and make the principal available according to the agreed schedule or, on many GICs, on a "full-flex" basis, as demanded by the municipality. This niche business operates within an evolving and complicated regulatory framework. It is an arcane and technically complex area that is considered more art than science with no cookie cutter prices or investments.

During the relevant time period, Carollo allegedly participated in two conspiracies involving (in each instance) his employer GE, and (in Count One) the investment contract broker Chambers, Dunhill, Rubin & Co. ("CDR") and (in Count Two) the investment contract broker Investment Management Advisory

7

Group, Inc. ("IMAGE"). A __, __ (Superseding Indictment ¶¶ 6, 18-21; 26, 26-29). Distilled to their essence, the charges against Carollo alleged that he conspired to defraud municipal bond issuers and the IRS in connection with the bidding and purchase of GICs, for the benefit of his employer, GE. *Id.*

Based on undisputed evidence introduced by Carollo, he stopped working for GE on November 8, 2002. *See* A __ (DC-DX 40 (GE email announcing Carollo's departure on November 8, 2002)). The internal organizational announcement circulated to GE employees on November 8, 2002 stated that "[e]ffective immediately, Dominick Carollo has decided to pursue other career opportunities." *Id.* GE announced that, in the wake of his departure, Shailesh Shah was promoted to "Chief Operating Officer" of GE's GIC unit. *Id.*

Further undisputed evidence introduced by Carollo established that in July 2003, Carollo created a competing GIC business for a newly formed provider, the Royal Bank of Canada Capital Markets Corp. ("RBC"). A__ (DC-DX 30A (FINRA registry form showing Carollo's RBC dates of employment, from July 2003 to July 2007)). The evidence established without dispute that in running RBC's GIC business, Carollo directly bid against GE for GIC business and beat them. For example, on cross examination by Carollo's counsel, GIC broker and alleged co-conspirator Stewart Wolmark testified that he understood that not only

8

did Carollo stop working for GE's interests – he worked against those interests –

while he ran the GIC desk at RBC:

> Q.  Now, let's turn, if we could, to your testimony concerning RBC.  You
> testified that Mr. Carollo left FGIC [the GIC unit at GE] and went to
> work at RBC, right?

> A.  Yes, I did.

> Q.  The time period, Mr. Carollo left FGIC about November 8, 2002,
> and he started at RBC about July 18, 2003.  Does that sound
> right?

> A.  Yes.

> Q.  And Mr. Carollo went to RBC to start up a GIC desk, didn't he?

> A.  Yes.

> Q.  *And he competed -- RBC competed in the GIC marketplace
> against other GIC providers like FGIC, didn't it?*

> A.  Yes.

Tr. 1619-20 (emphasis added).

Carollo introduced evidence showing that while he was running RBC's GIC

operation, RBC successfully competed against GE.  *See, e.g.*, A__ (DC-DX-01

(CDR Deal List)).  For instance, the evidence at trial from GE's own internal

database shows that RBC won 41 transactions which GE also bid on and attempted

to win.  *See* A __ (DC-DX-42 (GE-FGIC Deal List)); Tr. 2728.  Indeed, GE was

RBC's "cover" (*i.e.,* the second place bidder) on at least three of those transactions,

and RBC was the second place bidder on fifteen further transactions. *Id.* In addition, the evidence established that RBC won 14 GIC transactions bid out by CDR *after* Carollo began work at RBC. *See* A__ (DC-DX-01 at pp. 1-8 (CDR Deal List)).

Through his actions, Carollo's competitive threat, along with his separation from GE, was indisputably communicated to and understood by his erstwhile alleged co-conspirators. For instance, GE's own internal deal tracking database identified RBC as a "competitor" during Carollo's tenure there. *See* A__ (DC-DX-27A); Tr. 2728. In November 2002, Carollo's successor at GE, Shailesh Shah, even sent Carollo a warning letter cautioning him against using GE's confidential information. *See* A__ (DC-DX-24 (Nov. 13, 2003 letter from Shah to Carollo)). The letter, addressed to Carollo at RBC, admonished that he was "prohibited from disclosing or using confidential information of [GE]." *Id.* Carollo continued to compete against GE until the end of his RBC employment in July 2007. A __ (DC-DX 30A (FINRA registry form showing Carollo's RBC dates of employment, from July 2003 to July 2007)). The government did not introduce any evidence showing that Carollo, in any way, continued to act for GE's benefit *after* he stopped working for it.

**B.**    **Relevant Proceedings.**

    *1.*    *The Charged Conspiracies.*

On July 27, 2010, Mr. Carollo and two other former employees of GE were indicted in the Southern District of New York for their alleged participation in a conspiracy related to the bidding of GIC's.  As noted, the superseding indictment filed on May 31, 2011, charged Carollo with three counts of conspiracy, in violation of 18 U.S.C. § 371 (Counts One-Three), and one count of wire fraud, in violation of 18 U.S.C. § 1343 (Count Seven).  Following dismissal of Count Seven on August 25, 2011, on statute of limitations grounds, A__ (Ruling dated Aug. 25, 2011), Carollo remained charged in three bilateral conspiracies involving (in each instance) his employer GE, on the one hand, and the brokers, CDR, IMAGE, and Tradition, in Counts One through Three, respectively, on the other hand.  A __, __ (Superseding Indictment ¶¶ 6, 18-21; 26, 26-29; 33-37).  During the course of the proceedings, the government consistently represented to the district court that each charged conspiracy was based on a "separate bilateral agreement[]" between the defendants, a single GIC provider, and a single broker. *See, e.g.,* A__ (April 13, 2011 Ltr. from Antonia R. Hill to Judge Baer, at 2); A__ (Gov. Mem. in Opp. to Def. Pretrial Motions, July 27, 2011, at 19-20).

In each conspiracy count, Carollo was alleged to have conspired to defraud municipal bond issuers buying GICs and to defraud the IRS in regard to GE's

municipal GIC business. *Id.* The pleaded purpose of the conspiracies was to manipulate bidding on GICs to benefit his employer, GE. *See* A__-__ (Superseding Indictment, ¶¶ 18-21; 27-29; 34-37). For example, the Superseding Indictment charged the conspirators with the following:

> (a)    increasing or attempting to increase the number and profitability of investment agreements and other municipal finance contracts awarded to [GE] . . . through the control and manipulation of bidding for investment agreements and other municipal finance contracts; . . . .

A __ (Superseding Indictment ¶¶ 21, 29, 37). Indeed, the government has repeatedly and explicitly stated that the goal of each charged conspiracy was to benefit the GIC business of the provider specified in the respective count: each count purportedly involved a conspiracy in which "[a] particular provider agreed with a particular broker to secretly control and manipulate the bidding process so that the provider received the investment agreement at artificially determined and suppressed price levels *to the provider's benefit*," A__-__ (Gov. Mem. in Opp. to Def. Pretrial Motions, July 27, 2011, at 19-20 (emphasis added)), and the "goal was to get the issuer client of the co-conspiring broker to award the provider the contract at a more profitable rate. And because there are six different provider-broker agreements there are six separate goals." *Id.* Moreover, the government reemphasized this same theme in its closing argument. *See, e.g.*, Tr. 2981 ("There

are five charged counts.  The charges are broken down based on both where the defendants work and which corrupt broker helped carry out these schemes.")

There is no dispute that all of the allegedly fraudulent conduct concerning bidding on contracts by any conspirator occurred prior to July 27, 2004, as explained further in the briefs of Co-Appellants Grimm and Goldberg.

### 2.    *The Testimony of Adrian Scott-Jones and Related Rulings.*

At trial, the government presented testimony from its cooperating witness, Adrian Scott-Jones, who testified on direct on April 24 and 25, and was cross examined by counsel for Mr. Goldberg on April 25, 26 and 27, 2012.  *See* Tr. 1684-2182.    Scott-Jones testified longer than any witness.  He was the only witness to testify about the alleged existence of an express conspiratorial agreement with the defendants.  Aside from the sheer length of time on the stand, his testimony was also memorable for its inflammatory and colorful interpretations of over 100 audio recordings.  With a distinctive British accent, he put a decidedly inculpatory spin on all these tapes and argued that even the exculpatory sounding tapes should be disregarded as nothing more than "smoke and mirrors" or a "ruse." Tr. 1722 and 1711.  His testimony was also unforgettable in that he committed perjury and then vanished, before completing his cross examination.

During the lunch break on April 27, after admitting to perjury and just prior to cross examination by Carollo's counsel, Scott-Jones left the courthouse and

13

attempted to take his own life.  Tr. 2254-55, 2304, 2310-13.  He did not return to the trial, and counsel for Mr. Carollo and Mr. Grimm were unable to cross examine him.  A __ (Email from A. Hill to Court dated April 28, 2012).  The defense moved orally for a mistrial or, in the alternative, dismissal of Count Three, Tr. 2254-55, and repeated that request in writing.  A__ (Letter from W. Timpone to J. Baer dated April 30, 2012; Letter from J. Siffert to J. Baer dated April 29, 2012; Letter from H. Heiss to J. Baer dated April 29, 2012).  The district court denied the motion for mistrial.  Tr. 2255, 2545.

On April 30, the district court told the jury that Scott-Jones was unavailable and would not be returning to complete his testimony; however, the court advised the jury that it would still be able to consider his testimony, stating that, "*when you consider his testimony*, you will have to consider it with a lot of cautions that I will regale you with at the time of my charge, or maybe earlier . . . ."  Tr. 2316 (emphasis added).

It was not until the end of the day on May 1, 2012 (four days after Scott-Jones disappeared), that the court finally struck Scott-Jones' testimony.  Tr. 2693.  On May 2, the district court ruled outside of the presence of the jury that it was dismissing Count Three and striking the recordings and exhibits about which Scott-Jones testified.  Tr. 2699-2702.  Although the district court had advised the jury that the court would provide further instruction regarding Scott-Jones, Tr. 2693, it

14

never instructed the jury regarding these determinations; it expressly declined the defendants' request that it do so as part of its charge.  A __ (Letter from J. Smart to J. Baer dated May 7, 2012); Tr. 3200 ("I am not telling the jury at this late stage that evidence that Scott-Jones testified to . . . . is also stricken").[1]

>    3.  *The Post-Trial Motions.*

After the trial, Carollo sought acquittal notwithstanding the jury verdict on the grounds that he had withdrawn from the conspiracies outside the limitations period and that the government failed to present sufficient evidence against him. He also joined the defendants' joint motion for acquittal on the grounds that all charges were time barred.  A __, (Mem. of Law in Support of Carollo's R. 29 Motion for a Judgment of Acquittal dated July 13, 2012; Mem. of Law in Support of Defendants' Joint Motion for Judgment of Acquittal).  In opposing Carollo's withdrawal motion, the government relied primarily upon the argument that separation from GE in November 2002 and hiring by RBC in July 2003 did not constitute affirmative acts of withdrawal and upon speculation that while working at RBC Carollo *could* have continued to support the GE conspiracy.  A__ (Mem. of Law in Opp. to Defs. Jnt. Mtn. and Def. Carollo's Motion for Jdgmt. of Acquittal).

---

[1] The trial court stated to the jurors at the end of its charge only that they should "tear . . . out" of their notebooks any reference to Count Three, because the court had "stricken the count and the testimony."  Tr. 3244.

The district court orally denied the defendants' motions for acquittal at the start of defendants' sentencing hearing on October 18, 2012.  A __ (Minute Order dated Oct. 26, 2012); Sentencing Tr. 10/18/12 at 10-11.  The district court did not explain its reasoning regarding its rejection of Carollo's withdrawal argument, and it issued no written ruling regarding its decision.  *See id.*

## SUMMARY OF THE ARGUMENT

1.    The district court erred in not granting defendants acquittal as a matter of law because the overt acts involved in the charged conspiracies – the allegedly fraudulent bidding conduct – all indisputably occurred outside the statutory period.  The government attempts to extend the duration of the conspiracy through reliance upon the routine interest payments made by GE in connection with the GICs won through the allegedly corrupt bidding, payments which continue to this day, and, in some instances, will continue more than a decade beyond the completion of this prosecution.  However, the government's theory is unavailing: those payments constitute the results of the completed conspiracy, and not acts in furtherance of it.  As such, they do not continue the conspiracy for purposes of the statute of limitations.  Moreover, those payments do not continue the conspiracy because they were not made by co-conspirators.  At the very least, defendants deserve a new trial, because of the district court's erroneous statute of limitations instruction with respect to the requirement of an overt act within the statutory

16

period.  Mr. Carollo adopts and incorporates into his brief the statute of limitations arguments set forth on appeal by Co-Appellant's Grimm and Goldberg.

2.    The evidence at trial established beyond dispute that Carollo withdrew from the charged conspiracies outside the statutory limitations period.  The well-established rule is that a person withdraws from a conspiracy by taking some affirmative step to terminate or abandon his participation in it.  No particular, prescribed measure is necessary to effect withdrawal; rather, it can be accomplished through any sort of affirmative action that is inconsistent with the objects of the conspiracy, where such action is communicated to co-conspirators.

Under this legal framework, Carollo was entitled to acquittal as a matter of law.  The object of the charged conspiracies was to benefit his employer, GE, through bid manipulation to increase the profitability or number of the municipal investment contracts that GE won.  Carollo introduced evidence establishing beyond dispute that his employment with GE ended in November 2002 and that in July 2003 he began to work for another financial institution, RBC, where he built up a competing investment contract operation.  Both of these dates are incontestably outside the statutory limitations period.  The evidence established further that, in working for RBC, far from serving GE's bottom line, he competed against it in the marketplace for GICs, often successfully.  Moreover, it was undisputed that once he began to work for RBC, his former co-conspirators knew

17

that he was working for RBC's benefit, not GE's. The evidence, in other words, established beyond controversy that Carollo engaged in affirmative actions that were inconsistent with the object of the conspiracies and that his co-conspirators knew of those actions. He was therefore entitled to acquittal as a matter of law based upon his withdrawal from the charged conspiracies outside the limitations period, notwithstanding the jury's verdict.

3.   A new trial is warranted because the district court abused its discretion in failing to declare a mistrial after the government's main cooperating witness against Carollo, Adrian Scott-Jones, committed perjury and then disappeared,  leaving Carollo no opportunity for cross-examination.  The trial court's belated and inadequate remedial efforts did not cure the substantial prejudice caused by the jury's exposure to Scott-Jones' devastating, extensive and (by Carollo) unchallenged testimony.  Unlike the government's other cooperating witnesses, Scott-Jones incessantly (and falsely) attacked Carollo.  Because Carollo had no opportunity to correct Scott-Jones' many misstatements, the jury was left with the misimpression that Carollo was the architect of all the charged conspiracies – a misimpression that Scott-Jones exclusively created.  Scott-Jones' prejudicial and unchallenged testimony undoubtedly tainted the jury's view of Mr. Carollo and unfairly spilled over to the other alleged conspiracies where no such similar evidence existed.  These bizarre events also left Mr. Carollo unable to

introduce Scott-Jones' highly exculpatory prior statements, which would have been powerful evidence of Carollo's good faith and innocent intent across all counts.

The trial court's curative efforts were woefully inadequate to cure the severe prejudice caused by Scott-Jones' improper testimony. The striking of Scott-Jones' testimony came far too late - four days after he failed to return to court and eight days after his devastating testimony began - ensuring that his inflammatory and one-sided testimony was ingrained in the jurors' minds. Indeed, the trial court at one point before striking the testimony actually told the jurors that they would be allowed to consider Scott-Jones' testimony. This prejudice was compounded by the trial court's inexplicable refusal to inform the jury that the many audio recordings that Scott-Jones testified about (over 130) were also stricken. The fact that the jury was improperly affected by this outlandish sequence of events and inappropriate judicial response is based on more than abstract logic; it is obvious from the confusion displayed by the jury during deliberations through its notes to the court concerning the evidence about Mr. Carollo.

## ARGUMENT

I. **THE DISTRICT COURT ERRED IN NOT GRANTING ACQUITTAL AS A MATTER OF LAW BECAUSE THE CHARGES WERE BARRED BY THE STATUTE OF LIMITATIONS.**

The district court erred in not granting Carollo acquittal as a matter of law based on the statute of limitations. A conspiracy prosecution is timely only if a conspirator commits at least one overt act in furtherance of the conspiracy within the limitations period. *United States v. Grunewald*, 353 U.S. 391, 396 (1957). It is undisputed that the allegedly fraudulent bidding conduct – the focus of the government's case against the defendants – occurred outside the limitations period. With no bids occurring within the limitations period, the government attempted to latch onto the routine, periodic interest payments made by GE in connection with the GICs won through the alleged conspiracy to stretch the limitations period for decades beyond the last allegedly fraudulent bid. Those interest payments are insufficient as a matter of law to constitute overt acts within the limitations period, for the reasons explained further in the briefs of Co-Appellants Grimm and Goldberg. *See* Brief of Appellant Goldberg, Argument Section I; Brief of Appellant Grimm, Argument Section I. Their arguments are adopted and incorporated herein by reference pursuant to Fed. R. App. P. 28(i). For the reasons set forth therein, the district court erred in not granting Carollo acquittal as a matter

of law on the grounds of the statutes of limitation, and his convictions should be reversed. At the very least, a new trial is required because the court declined defendants' request to instruct the jury properly with respect to the requirement that the jury find an overt act in furtherance of an ongoing conspiracy within the limitations period, as explained in co-defendants' briefs on appeal. *See* Brief of Appellant Goldberg, Argument Section II; Brief of Appellant Grimm, Argument Section I.C.

## II. THE DISTRICT COURT ERRED IN NOT GRANTING ACQUITTAL AS A MATTER OF LAW BASED ON DEFENDANT CAROLLO'S WITHDRAWAL DEFENSE.

### A. Standard of Review.

This court "review[s] *de novo* . . . a denial by a district court of a Federal Rule of Criminal Procedure 29[] motion, applying the same standards as the District Court." *United States v. Celaj*, 649 F.3d 162, 167 (2d Cir. 2011) ; *see also United States v. Coplan*, 703 F.3d 46, (2d Cir. 2012); *United States v. Yannotti*, 541 F.3d 112, 120 (2d Cir. 2008).

Where the "evidence is insufficient to sustain a conviction," and judgment in favor of defendant is appropriate as a matter of law, the Court must grant an acquittal notwithstanding a guilty verdict. Fed. R. Crim. P. 29(a); *see also* Fed. R. Crim. P. 29(c). While "the evidence [should] be viewed in the light most favorable to the government and all permissible inferences drawn in its favor," *United States*

*v. D'Amato*, 39 F.3d 1249, 1256 (2d Cir. 1994), "a conviction based on speculation and surmise alone cannot stand." *Id.* Courts "do not permit juries to speculate in order to draw their conclusions." *United States v. Nelson*, 277 F.3d 164, 217 (2d Cir. 2002) (Parker, J., dissenting and concurring), and "it is the duty of the court to withdraw the case from the jury when the necessary inference is so tenuous that it rests merely upon speculation and conjecture." *Radiation Dyn., Inc. v. Goldmuntz*, 464 F.2d 876, 887 (2d Cir. 1972). Such a result is warranted where, as here, the evidence at trial establishes the propriety of acquittal as a matter of law because the defendant withdrew from the charged conspiracy outside the limitations period. *See, e.g., United States v. Goldberg*, 401 F.2d 644 (2d Cir. 1968).

## B. The Undisputed Evidence Established as a Matter of Law that He Withdrew from the Charged Conspiracies Before July 27, 2004.

The evidence at trial established beyond dispute that Carollo withdrew from the charged conspiracies outside the statutory limitations period, as he stopped working for GE and committed acts inconsistent with the objects of the alleged conspiracy by directly competing in the GIC marketplace against his former employer before the key date of July 27, 2004. It is well-settled that the statute of limitations as to a particular conspirator begins to run once he "affirmatively withdraw[s] from the conspiracy." *United States v. Salerno*, 868 F.2d 524, 534 n. 4 (2d Cir. 1989). The wire fraud and *Klein* conspiracies alleged in Counts One and

Two have a five-year and six-year statute of limitations, respectively.  *See* 18 U.S.C. § 3282(a); 26 U.S.C. § 6531(1).  The Indictment here was returned on July 27, 2010.  The prosecution in this case is thus untimely as to Carollo insofar as he withdrew from the charged conspiracies before July 27, 2004.

A person withdraws from a conspiracy by taking some affirmative step to terminate or abandon his participation in it.  *United States v. LaMorte*, 950 F.2d 80, 84 (2d Cir. 1991).  This can be accomplished "by doing acts which are inconsistent with the objects of the conspiracy."  *United States v. Carneglia*, 403 Fed. Appx. 581, 585-86, 2010 WL 5129122 (2d Cir., Dec. 17, 2010); *LaMorte*, 950 F.2d at 84. The courts have emphasized that, although a defendant claiming withdrawal has the burden of establishing an effective withdrawal through evidence of affirmative action, *see, e.g., Smith v. United States*, 568 U.S. __, No. 11-8976, slip op. at 8 (Jan. 9, 2013); *Goldberg*, 401 F.2d at 648, no particular affirmative action is prescribed in order to accomplish withdrawal.  *See United States v. United States Gypsum Co.*, 438 U.S. 422, 464 (1978).

In *Gypsum*, the Supreme Court found that the district court had erroneously limited the options available to the defendant to establish withdrawal.  The trial court had instructed the jury that to prove withdrawal, the defendant had to show that he had disclosed the scheme to law enforcement officials or had "affirmatively notified each other member of the conspiracy he will no longer participate in the

undertaking so they understand they can no longer expect his participation or acquiescence."   438 U.S. at 463-64.  The Supreme Court reversed, finding that the instruction "limited the jury's consideration to only two circumscribed and arguably impractical methods of demonstrating withdrawal."   *Id.*   The Court explained that the law does not mandate that "confining blinders be placed on the jury's freedom to consider evidence" of withdrawal and instructed that "[a]ffirmative acts inconsistent with the object of the conspiracy and communicated in a manner reasonably calculated to reach coconspirators have generally been regarded as sufficient to establish withdrawal or abandonment."   *Id.* at 464-65.

This Court has also emphasized that the test for withdrawal is not narrowly viewed.  The Court has instructed explicitly that the standard does "not compel a conspirator to inform on his or her co-conspirators or to warn-off possible victims, admirable as those actions might be," *United States v. Greenfield*, 44 F.3d 1141, 1150 (2d Cir. 1995), and the Court has noted that proof of "communication of . . . abandonment in a manner reasonably calculated to reach co-conspirators" suffices. *United States v. Berger*, 224 F.3d 107, 118 (2d Cir. 2000) (quoting *United States v. Borelli*, 336 F.2d 376, 388 (2d Cir. 1964)).  In *Goldberg*, cessation of employment from a company whose employees were involved in a conspiracy to sell worthless stock through fraudulent means, coupled with the fact that "[t]here [wa]s no

question that his co-conspirators knew of [defendant's] withdrawal from [the company's] operations," established defendant's withdrawal as a matter of law. *Goldberg*, 401 F.2d at 648-49. The defendant's resignation and notification of his departure to his customers and his licensing organization were held to constitute effective withdrawal, without any more particular communication of withdrawal to his co-conspirators or the world at large. *Id.*

Pursuant to this legal framework, Mr. Carollo is entitled to acquittal as a matter of law. As noted, Carollo was charged with participating in two separate "bilateral" conspiracies, each alleging an agreement between one specific GIC provider – his employer GE – and one specific GIC broker, with the specific purpose of winning GICs at suppressed rates for GE. A__ (April 13, 2011 Ltr. from Antonia R. Hill to Judge Baer, at 2); A__ (Superseding Indictment ¶¶ 21, 29). As the government explicitly represented, each count involved a conspiracy in which "[a] particular provider [GE] agreed with a particular broker to secretly control and manipulate the bidding process so that the provider received the investment agreement at artificially determined and suppressed price levels to the provider's benefit," and the "goal was to get the issuer client of the co-conspiring broker to award the provider the contract at a more profitable rate." A__ (Gov. Mem. in Opp. to Def. Pretrial Motions, July 27, 2011, at 19-20).

In this light, the evidence at trial established beyond dispute that Carollo withdrew from the charged conspiracies in November 2002 as he stopped trying to win GICs on GE's behalf and thereafter committed acts inconsistent with the objects of the alleged conspiracy – *i.e.*, directly competing in the GIC marketplace to win GICs at GE's expense. *See* A __ (DC-DX 40 (GE email announcing Carollo's departure on November 8, 2002)), and A __ (DC-DX 30A (FINRA registry form showing Carollo's RBC dates of employment, from July 2003 to July 2007)). Indeed, GE and the entire niche GIC industry understood, as of July 2003, that Carollo was working for RBC's benefit, not GE's. For example, as discussed above, GIC broker Stewart Wolmark testified that Carollo was a direct competitor of GE after he left it and launched a GIC unit for RBC, Tr. 1619-20, and the exhibits further demonstrated that while its GIC operation was run by Carollo, RBC successfully defeated GE in competing for GIC business. As set forth on the CDR Deal List, RBC won 14 GIC transactions bid out by CDR *after* Carollo began work at RBC, *see* A__-__ (DC-DX-01 at pp. 1-8 (CDR Deal List)), and the evidence at trial from GE's own internal database shows that RBC won 41 additional transactions on which GE bid. *See* A__ (DC-DX-42 (GE Deal List)). RBC was the second place bidder on fifteen other transactions that GE also bid on. *Id.*

Moreover, by starting up a GIC desk at RBC and directly competing against GE, Carollo clearly communicated to his alleged co-conspirators and the entire GIC marketplace that he was no longer acting for the benefit of GE and was no longer pursuing the goals of the charged conspiracies identified in the superseding indictment.  As the goal of the charged Count One and Two conspiracies was to "increase the number and profitability of investment agreements and other municipal finance contracts awarded to [GE]," A__ (Superseding Indictment ¶¶ 21(a), 29(a)), Carollo openly acted against those goals by striving to win business from GE.  In fact, he openly acted *against* these goals so much so that Carollo's successor at GE, Shailesh Shah, sent Carollo a warning letter cautioning him against using GE's confidential information to try and quell his competitive threat.  *See* A__ (DC-DX-24 (Nov. 13, 2003 letter from Shah to Carollo)) and A__ (DC-DX-40 (GE organizational announcement)).  GE's own internal deal tracking database even identified RBC as a "competitor" during Carollo's tenure at RBC.  *See* A__ (DC-DX-27A).

Simply put, the record establishes beyond controversy that Carollo "d[id] acts which [we]re inconsistent with the objects of the conspiracy."  *Carneglia*, 403 Fed. Appx. at 585-86, 2010 WL 5129122.  And "[t]here is no question that his [alleged] co-conspirators knew of his withdrawal from [GE's] operations."  *Goldberg*, 401 F.2d at 648; *cf. Gypsum*, 438 U.S. at 464 (resumption of

27

competitive activity constitutes "[a]ffirmative acts inconsistent with the object of the conspiracy [to fix prices and restrain trade] and communicated in a manner reasonably calculated to reach coconspirators").

The record lacked any evidence to rebut Carollo's withdrawal or otherwise show that he took any actions in furtherance of the charged GE-centric conspiracies after he stopped working for GE in November 2002. As noted, in opposing Carollo's motion based on withdrawal, the government relied primarily upon the argument that separation from GE in November 2002 and hiring by RBC in July 2003 did not constitute affirmative acts of withdrawal because Carollo did not take action to unwind the allegedly rigged contracts or prevent harm to victims of the conspiracy, and it speculated that while working at RBC Carollo could have continued to support the GE conspiracy. A__ (Gov. Mem. of Law in Opp. to Defs. Jnt. Mtn. and Def. Carollo's Motion for Jdgmt. of Acquittal). However, these arguments fail.

The government's assertion that Carollo presented no evidence of affirmative acts of withdrawal distorts the evidence that Carollo presented and ignores the applicable law. While it is true that "resignation from the enterprise [engaged in the conspiracy] does not, in and of itself, constitute withdrawal from a conspiracy as a matter of law," *Berger*, 224 F.3d at 119 (internal quotation marks and citation omitted), Carollo presented more than mere evidence that his

employment with GE ended and he got a new job.  Given that the purpose of the alleged conspiracies was to increase the number and profitability of GE's municipal finance agreements through bid manipulation, all avowedly for the benefit of GE,[2] Carollo's evidence of competition in the GIC market *against* GE after starting a competing GIC unit at RBC necessarily establishes that he "d[id] acts which [we]re inconsistent with the objects of the conspiracy."  *LaMorte*, 950 F.2d at 84.  This evidence of withdrawal – ignored by the government but uncontroverted – dictates reversal of Carollo's convictions.

Moreover, the government's insistence that Carollo had to act to take action to unwind the allegedly rigged contracts or to protect the municipalities is based on a misconstruction of the law.  There is no such requirement:  this Court has held that the test for withdrawal does "not . . . compel a conspirator to inform on his or her co-conspirators or to warn-off possible victims, admirable as those actions might be."  *Greenfield*, 44 F.3d at 1150.

The government's remaining claims regarding Carollo's activities while at RBC are also unavailing.  The government relies upon certain evidence concerning transactions between RBC and Mr. Goldberg's post-GE employer, Financial Security Assurance Capital Management Services LLC ("FSA"), which caused a brokerage commission to be paid to CDR.  *See* Tr. 3190.  However, the RBC-FSA

---

[2] *See* A__ (Superseding Indictment ¶¶ 21(a), 29(a)); A__ (Gov. Mem. in Opp. to Def. Pretrial Motions, July 27, 2011, at 19-20).

swaps were not in furtherance of any conspiracy charged against Carollo. (Moreover, the RBC-FSA swaps were in any event approved by Carollo's superiors at RBC.  Tr. 1622.)  That activity was adduced to support the charge against Mr. Goldberg in Count Five (which alleged a bilateral conspiracy involving FSA and CDR, and in which Carollo was not charged) and was clearly outside the scope of the conspiratorial agreements alleged in the GE-centric counts as it had nothing to do with GE and did not benefit GE in any manner.

The "scope of the conspiratorial agreement … determines both the duration of the conspiracy, and whether the act relied on as an overt act may properly be regarded as in furtherance of the conspiracy."  *Grunewald*, 353 U.S. at 396-97.  Here, as the district court instructed the jury, it was an essential element of the conspiracies charged against Carollo that they involve "an unlawful agreement between the particular provider [*i.e.,* GE] and the particular broker as charged in each separate Count."  Tr. 3222.  Thus, even accepting the government's position that Carollo (while he was at RBC) engaged in concerted activity with Mr. Goldberg (while he was at FSA), such actions were clearly not within the scope of the charged conspiratorial agreements and "were not in furtherance of the conspirac[ies'] pleaded purpose."  *United States v. Salmonese*, 352 F.3d 608, 615-16 (2d Cir. 2003) (citing *United States v. Roshko*, 969 F.2d 1, 8 (2d Cir. 1992)).  While the evidence of those actions was undoubtedly confusing to the jury and

30

should not have been admitted,[3] those actions are irrelevant as a matter of law for statute of limitations purposes as to the charges against Carollo in Counts One and Two.

In opposing Carollo's motion for a judgment of acquittal as a matter of law, the government responded to this issue by engaging in rank speculation regarding Carollo's activities while working at RBC. The government stated that "[w]hile Carollo's [service as a swap counterparty in connection with FSA business] concerned the CDR-FSA conspiracy, it demonstrates that even in his RBC position he *could have* just as easily participated in the GE conspiracies." A__ (Gov. Mem. of Law in Opp. to Defs. Jnt. Mtn. and Def. Carollo's Motion for Jdgmt. of Acquittal). However, there was *no* evidence that he actually did so. That the government stoops to such conjecture confirms that no rational jury could find that Carollo remained in the GE conspiracies.

In short, in light of the framing of the charges and the applicable law regarding those charges, the evidence established affirmatively that Carollo had withdrawn from the GE-CDR and the GE-IMAGE conspiracies before the crucial July 27, 2004 date. There was no basis for a reasonable conclusion that Carollo remained involved in the charged conspiracies during the limitations period, and,

---

[3] Carollo moved *in limine* to exclude the admission of this uncharged activity and/or to sever the trial of the FSA counts from the GE counts. A__-__, __ - __ (Motion to Limit Government's Introduction of Evidence of Uncharged Acts; Motion to Sever Dated Feb. 27, 2012).

31

accordingly, a judgment of acquittal is warranted on Counts One and Two as a matter of law.

## III. THE DISTRICT COURT ERRED IN DENYING CAROLLO'S MOTION FOR A MISTRIAL IN LIGHT OF THE INCURABLE PREJUDICE POSED BY SCOTT-JONES' ABORTED TESTIMONY.

Carollo's convictions should be reversed because the trial court abused its discretion in failing to declare a mistrial after the government's key cooperating witness against Carollo, Adrian Scott-Jones, committed perjury and then made himself unavailable to be cross-examined by Carollo. While the trial court belatedly struck Scott-Jones' testimony and dismissed Count Three of the superseding indictment, these steps did not cure the substantial, undue prejudice created by Scott-Jones' aborted testimony. Carollo was irredeemably prejudiced by Scott-Jones' many damaging misstatements, which Carollo was denied the opportunity to correct, and by the denial of his ability to present important exculpatory evidence when Scott-Jones discontinued his testimony.

Co-Appellant Peter Grimm – who was also unable to cross examine Scott-Jones – has explained to the Court the lingering prejudice caused by Scott-Jones' abandoned testimony conjoined with the inability of counsel to cross examine him, as well as the gross inadequacy of the district court's curative measures. *See* Brief of Appellant Grimm, Argument Section II. Grimm's arguments are equally applicable with respect to Mr. Carollo, and we incorporate them here by reference.

Fed. R. App. P. 28(i).  We write separately to explain the particular prejudice caused to Mr. Carollo by Scott-Jones' unfinished testimony and the inadequacy of the district court's response.  For the reasons explained herein and by Mr. Grimm, the trial court erred in declining to grant Carollo's motion for a mistrial.

## A.    <u>Standard of Review.</u>

"Courts have the power to declare a mistrial 'whenever, in their opinion, taking all the circumstances into consideration, there is a manifest necessity for the act, or the ends of public justice would otherwise be defeated.'"  *United States v. Klein*, 582 F.2d 186, 190 (2d Cir. 1978) (quoting *United States v. Perez*, 22 U.S. 579, 580 (1824)).  The denial of a mistrial application is reviewed for abuse of discretion.  *See United States v. Rodriguez*, 587 F.3d 573, 583 (2d Cir. 2009).

## B.    <u>Scott-Jones' Testimony Unduly and Irredeemably Prejudiced Carollo.</u>

Scott-Jones was the government's primary witness against Carollo.  With flamboyant and unforgettable flair, he placed Carollo at the creation of all the charged conspiracies.  *See, e.g.*, Tr. 1697-1699.  In so doing, he provided detailed and graphic descriptions of Carollo's central role as the alleged leader of the conspiracies.  No other witness provided similar testimony about Carollo.  In fact, due to the lack of personal interactions between the government's other

cooperating witnesses and Carollo, Carollo substantively cross-examined only one of the government's six other cooperators.[4]

In stark contrast with the testimony of these other cooperators, Scott-Jones, at every opportunity, branded Carollo as the architect of the alleged conspiracy. Repeatedly throughout his testimony, Scott-Jones claimed that Carollo devised a plan to pay brokers extra fees in exchange for "last looks" during a lunch meeting at a midtown Manhattan Italian Restaurant in August 1999.  Tr. 1697-1699; Tr. 1812.  He testified:

> Q.  I want to direct your attention now, Mr. Scott-Jones, to approximately August 1999.  Did you have occasion to meet with any of the defendants?
>
> A.  I did, ma'am.
>
> Q.  Who did you meet with?
>
> A.   Mr. Dominick Carollo, Mr. Steven Goldberg, Mr. Ron Jampel, and of course myself.
>
> * * * *
>
> Q.  Sir, what, if anything, did Mr. Carollo say during this lunch meeting?

---

[4]  The one cooperator Carollo substantively cross-examined, Stewart Wolmark, testified nothing like Scott-Jones as it pertained to Carollo.  Wolmark conceded that he had little day-to-day dealings with Carollo as Carollo did not participate in bidding activities and was too busy attending to other duties.  Tr. 1604-06.  Wolmark's one arguably inculpatory statement that he allegedly gave Carollo last looks *before* the period charged in the superseding indictment was clearly impeached and withered away on cross-examination.  Tr. 1601-1604.

A.  He was welcoming Steven Goldberg on board.  We discussed the general business.  And then Mr. Carollo said, We'd like you to start showing us your big deals.  We discussed the longer term deals, like the Massachusetts Water Pollution Abatement Trust. They have very large long-term reserve funds.  And he said, I would like you to show me these, and we'd like to try to win these, and we will win them, and we will try and make some sort of fee available to you once we win the transactions.

Q.  Did Mr. Carollo explain how he expected to win those transactions?

A.  Yes.  I was going to give him what they call last look, extra information over and above the rest of the competitors in that bid process.

Q.  What were you to receive in exchange?

A.  It wasn't clear at the time what kind of vehicle that would take place, but it would be extra fees on the back of what we would have got for the normal brokerage.

Q.  What, if anything, did Mr. Carollo say about why he wanted you to help GE win deals at this particular time?

A.  He wanted to build his book up, ma'am.

Q.  Did you agree with Mr. Carollo's proposal?

A.  I did, ma'am.

Tr. 1697-1699.

Scott-Jones stressed that the "first idea" of paying so-called kickbacks for last-looks "came from Mr. Carollo at lunch in August 1999." Tr. 1812.  Indeed, Scott-Jones went back to this alleged August 1999 lunch meeting (although defense evidence would have shown that it never took place) over ten times to put

35

a negative spin on defendants' legitimate, good faith activities, such as their seeking legal review and approval to pay him and other brokers a referral fee for new business opportunities. He claimed such actions were a subterfuge to cover-up the understanding reached at the fictitious August 1999 lunch meeting. *See, e.g.,* Tr. 1715 ("Well, if we go back to our lunch with Mr. Carollo and Mr. Jampel and Mr. Goldberg"); Tr. 1716 (calling certain representations "inaccurate because there was an oral agreement with Mr. Carollo, Mr. Goldberg, on the bidding process that, yes, there was an oral agreement to receive other fees"); Tr. 1720; 1726-27; 1748-49; 1761; 1780 ("Getting back to the oral agreement with Mr. Goldberg and Mr. Carollo, we were going to give him last look and then obviously we were going to receive the interest rate swap payment for fees derived from that trade"); Tr. 1811; 1812; 1959. Although Scott-Jones expressly said on tape that the payments were for referrals only, *see* SGX146403 (Scott-Jones told Goldberg "[a]ll we can do is open doors, we can make introductions, but we can't guarantee anything after that") and SGX146399 (Scott-Jones telling Goldberg that there had to be a "Chinese wall" so that there would be no connection between referrals and winning a GIC), during his testimony he repeatedly characterized defendants' attempts to legally structure finder's fees as nothing more than "smoke and mirrors." *See, e.g.*, Tr. 1962.

36

Globally, this testimony was significant because Scott-Jones was the first GIC broker to receive swap fees from GE. As explained in Co-Appellant Goldberg's brief, defendants' efforts to lawfully structure referral payments to Scott-Jones were used as a model for similar payments to other GIC brokers. *See See* Brief of Appellant Goldberg, Argument Section III.A at 50-51. As such, Scott-Jones' testimony that the model was an illegitimate facade unavoidably tainted the jury's view of the other broker relationships. As it specifically relates to Carollo, this testimony was particularly devastating. By pinning the "first idea" to pay what he characterized as unlawful kickbacks on Carollo, Scott-Jones effectively shaded all other broker swap payments as kickbacks and labeled Carollo as the creator of the kickback concept. Having been exposed to this testimony, the jury was led to improperly infer that Carollo must have created similarly corrupt relationships with brokers CDR and IMAGE as well.

Scott-Jones also attacked Carollo on another key issue regarding an alleged $300,000 debt. During his direct examination, the government played a vicious and unforgettable call, more than ten minutes in duration, in which Scott-Jones relentlessly berates Goldberg over the alleged debt. GX581866. According to Scott-Jones, GE owed him this money for receiving last looks on several GIC transactions. This alleged debt remained unpaid when Goldberg left GE a few months later. Scott-Jones testified that Carollo was "aware" of the debt at the time

37

of Goldberg's departure and that Carollo directed Grimm to pay it off. Tr. 1813-14. Rounding out the issue, Scott-Jones misleadingly testified that there came a time when the debt was paid off – insinuating, in testimony that Carollo never had the opportunity to challenge, that Carollo arranged payment of the $300,000. Tr. 1830. The improper prejudice to Carollo of this unchallenged testimony was magnified by the fact that Carollo, in his opening argument, had made the refusal to pay this alleged debt a centerpiece of his defense, as discussed further below. *See* Tr. 290-291.

On his fourth day of testimony, after admitting he committed perjury the day before, Scott-Jones left the courthouse during a lunch break and attempted to take his own life. He did not return. This bizarre set of circumstances rendered Scott-Jones' testimony particularly prejudicial to Mr. Carollo, who was completely deprived of the right to cross-examine his primary accuser – on all counts.

This Court has emphasized that the Confrontation Clause of the Sixth Amendment includes an inherent mandate guaranteeing criminal defendants the opportunity for cross-examination of the witnesses against them. *Cotto v. Herbert*, 331 F.3d 217, 229, 245 (2d. Cir. 2003) (citing *Davis v. Alaska*, 415 U.S. 308, 315-16 (1974)). As the Supreme Court has stated, "Cross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested," *Davis*, 415 U.S. at 316, and "[t]he opportunity for cross-examination,

protected by the Confrontation Clause, is critical for ensuring the integrity of the fact-finding process." *Kentucky v. Stincer*, 482 U.S. 730, 736 (1987). For these reasons, it is axiomatic that testimony not subject to an opportunity for cross-examination must be stricken. *See, e.g., Dunbar v. Harris*, 612 F.2d 690, 692 (2d Cir.1979); *United States v. Cardillo*, 316 F.2d 606, 611 (2d Cir. 1963); *accord United States v. Malsom*, 779 F.2d 1228, 1239 (7th Cir. 1985); *United States. v. Lyons*, 703 F.2d 815, 819 (5th Cir. 1983).

The prejudice caused by Carollo's inability to cross examine Scott-Jones was very real. Before Scott-Jones intentionally absented himself, Carollo provided the trial court with a binder of the audio file transcripts and documents he intended to use on cross-examination and later provided the trial court with a detailed offer of proof to demonstrate the harm inflicted by Scott-Jones' absence. *See* A__ (Letter from W. Timpone to J. Baer dated April 30, 2012). As set forth in Carollo's April 30, 2012 letter to the trial court, cross-examination would have shown that Carollo did not attend lunch with Scott-Jones in August 1999 where the conspiracy was allegedly born and that Scott-Jones' repeated testimony concerning the alleged meeting was a complete fabrication. Instead, the evidence would have shown that Scott-Jones' testimony was likely concocted due to his bias and extreme dislike for Carollo. *See Brinson v. Walker*, 547 F.3d 387, 392-93 (2d Cir. 2008) (citing *Greene v. McElroy*, 360 U.S. 474, 496 (1959)) ("Certain principles

have remained relatively immutable in our jurisprudence," including the right of the accused to challenge "the testimony of individuals . . . who . . . might be perjurers or persons motivated by malice, vindictiveness, intolerance, prejudice, or jealousy.").

The audio files cited in the April 30 letter and contained in the Carollo cross-examination binder showed that Carollo lunched with people other than Scott-Jones on August 30 and 31, 1999 – the only possible dates the alleged lunch could have taken place, given Goldberg's starting date and Scott-Jones' insistence that the meeting took place in August.  The materials also showed that Scott-Jones directly told the government during interviews that he did not like Carollo.  His strong dislike of Carollo was also evident on the audio recordings cited in the letter.    On these calls, Scott-Jones mocks Carollo and describes him as unintelligent, a poor communicator, stupid, naïve, and an "idiot."  *See, e.g.,* GX568817 (Scott-Jones maliciously ridiculing Carollo's Brooklyn accent and intelligence).  Such evidence would have shown Scott-Jones' motive to "point the finger" at Carollo.  Without the benefit of this information, the jury was left to credit Scott-Jones' uncorroborated testimony that Carollo was the initiator of the alleged kickback-for-bid assistance scheme.

Cross-examination also would have undercut Scott-Jones' testimony about the alleged $300,000 debt.  As noted, Scott-Jones testified that at the time of

Goldberg's departure, Carollo knew the sum of $300,000 was owed for steering deals, and Scott-Jones insinuated that Carollo arranged the payment of these monies. Such testimony, however, was completely at odds with Scott-Jones' prior statements to prosecutors cited in the April 30 letter: in fact, Scott-Jones admitted to prosecutors during interviews that Carollo stopped him from getting paid. *See* A __, __, __ (Letter from W. Timpone to J. Baer dated April 30, 2012, quoting A. Scott-Jones 3500 Materials; IRS-CI Memorandum of August 18, 2009 Interview, Bates No. 3506-6/CGG-ROI-0320, ¶ 9 ("*Jones thought Carollo was the reason that Jones did not get paid*" (emphasis added); IRS-CI Memorandum of May 13, 2009 Interview, Bates No. 3504-4/CGG-ROI-0306, ¶ 23 ("eventually cut off Carollo with respect to providing last looks, in part because he did not like Carollo and also because FGIC did not pay the $300,000")). By not having the opportunity to cross-examine Scott-Jones, Carollo was unable to introduce these highly exculpatory prior statements.

## C. <u>The Trial Court's Remedial Measures Were Inadequate.</u>

In the face of the bizarre sequence of events concerning Scott-Jones' testimony, the trial court's curative efforts were inadequate. Striking Scott-Jones' testimony and the evidence introduced through him and dismissing Count Three could not cure the substantial prejudice suffered by Carollo. Declaring a mistrial was the only viable solution.

The presumption that a jury has followed a court's instruction to disregard stricken testimony is overcome where "it appears probable that . . . responsible jurors will not be able to put the testimony to one side, and . . . the testimony will likely be seriously prejudicial to the aggrieved party." *United States v. Sepulveda*, 15 F.3d 1161, 1185 (1st Cir. 1993); *see United States v. Gomez*, 617 F.3d 88, 96 (2d Cir. 2010) (same). In this case, it is clearly more than "probable" that the court's curative efforts could not erase from jurors' minds the impact of Scott-Jones' testimony in their consideration of the remaining charges against Mr. Carollo.

Indeed, the simple fact that Scott-Jones' testimony was so provocative and extensive, so focused on Carollo and uniformly supportive of the government's claims against him – because it had never been tested by his lawyers' cross examination – rendered it extremely unlikely that the jury could put it out of mind as the Court instructed. *Cf. United States v. Geaney*, 417 F.2d 1116, 1120 (2d Cir. 1969) (when improper evidence "was so large a proportion of the proof as to render a cautionary instruction of doubtful utility," the court must "declare a mistrial if the defendant asks for it"); *United States v. DeDominicis*, 332 F.2d 207, 210 (2d Cir. 1964) (finding error in the denial of motion for mistrial and remanding for a new trial based on the prejudice caused by improper hearsay evidence, notwithstanding the attempted curative instruction: "Error in admitting evidence

may be cured by instructing the jury to disregard it unless it is so prejudicial that the jury will unlikely be able to erase it from their minds  . . . . If it is so prejudicial, a mistrial should be ordered" (internal quotations omitted)); *Lyons*, 703 F.2d at 819 (although "[o]rdinarily, the appropriate relief [where defendant has been unable to fully cross examine a witness due to his invocation of the Fifth amendment] is for the trial judge to strike the direct testimony of the witness . . . . [i]f the direct testimony is especially prejudicial," this remedy is inadequate;  "On the premise that the jury could not follow the instruction to disregard the witness' testimony, we have then required a mistrial").  Here, Scott-Jones' testimony was made all the more unforgettable for the jury by his admitted perjury and his dramatic disappearance in the middle of his testimony.  Under these circumstances, the undue prejudice from his testimony could be cured only through the granting of a new trial.

The similarity in the structure of each of the charges made the risk of taint from the stricken evidence particularly acute.  Count One, Count Two and the stricken Count Three each had the same structure:  Mr. Carollo, on behalf of GE, was alleged to have conspired with a broker, his co-defendants and others to increase the number and profitability of GICs won by GE through manipulation of the bidding, and to pay kickbacks through swap fees in return.  Indeed, in its closing, the government itself repeatedly emphasized for the jury the similarity of

the scheme across counts, telling the jury as it shifted focus from count to count, "same scheme, different broker." Tr. 3016; *see also, e.g.,* Tr. 2982-83 ("new company, same scheme"). Moreover, Mr. Carollo's defense to each count was substantially the same: the absence of fraudulent intent. In this context, there is a high likelihood that Scott-Jones' testimony – the only testimony concerning allegedly explicit conspiratorial discussions and corrupt agreements by Carollo, or any defendant – continued to impact the jury's view of the key issues in regard to the remaining charges, notwithstanding the court's curative efforts.

In particular, with no cross-examination of Scott-Jones by Carollo's counsel, the jury was left with the misimpression from Scott-Jones' testimony that Carollo was the mastermind behind the alleged conspiracies. Without the benefit of the information regarding Scott-Jones' fabrication of the restaurant meetings where Carollo supposedly made the corrupt proposal that Scott-Jones attributed to him, the jury was left to wrongfully speculate that Carollo carried over the same corrupt model to his later interactions with GIC brokers CDR (Count One) and IMAGE (Count Two). The likelihood of improper taint is particularly great in light of the government's speculative argument at closing that "Carollo may not be on the calls but he is still controlling the scheme from on high."[5] Tr. 3019-20. Notwithstanding the striking of Scott-Jones' testimony, in hearing such arguments

---

[5] As the government conceded during its closing, Tr. 3019-20, Carollo was on very few of the calls placed into evidence by the government at trial – just 14 out of more than 130.

the jury could not help but recall Scott-Jones' colorful, repeated testimony of conspiratorial machinations by Mr. Carollo.  Indeed, Scott-Jones was the only witness who testified that Carollo in any way controlled the alleged fraudulent scheme.

Moreover, by not having the opportunity to cross-examine Scott-Jones, Mr. Carollo was unable to introduce the highly exculpatory prior statements of Scott-Jones to investigators regarding Carollo's refusal to pay him the $300,000 in kickbacks that he claimed GE owed him after Goldberg's departure along with audio files cited in his April 30 letter that corroborated Scott-Jones' statements to investigators.  *See* A __, __, __ (Letter from W. Timpone to J. Baer dated April 30, 2012, quoting A. Scott-Jones 3500 Materials – IRS-CI Memorandum of August 18, 2009 Interview, Bates No. 3506-6/CGG-ROI-0320, ¶ 9 ("Jones thought Carollo was the reason that Jones did not get paid"); and IRS-CI Memorandum of May 13, 2009 Interview, Bates No. 3504-4/CGG-ROI-0306, ¶ 23 (Scott-Jones "eventually cut off Carollo with respect to providing last looks, in part because he did not like Carollo and also because FGIC did not pay the $300,000")).  This was particularly prejudicial to Carollo because he opened on his refusal to pay Scott-Jones this money and made it the centerpiece of his innocent intent defense:

> When Adrian Scott-Jones . . .  claimed that he was owed money in violation of Dom's rules, you will learn that Dom said no, that I am not paying you, that you can't have the money.  You will learn that Adrian Scott-Jones was so infuriated that he stopped doing business

> with Dom.  He holds a grudge against Dom to this day for not paying him the monies that he believed he was owed.  And I submit to you that there is no better evidence of Dom's desire to do the right thing in the right way than his willingness to lose business because he didn't want monies paid out that he didn't believe needed to be paid out.  And it follows again, no intent to defraud.

Tr. 290-291.  Having opened on Carollo's refusal to pay, and with the jury having gotten the misimpression from Scott-Jones' unrebutted testimony that Carollo made sure that Scott-Jones got paid, Carollo's defense was incurably undermined.  Equally prejudicial, Carollo was foreclosed from presenting powerful evidence of his good faith and innocent intent – evidence that could have swayed the jury to return a not guilty verdict.

The need for a new trial here is accentuated by the insufficient and problematic nature of the district court's curative efforts.  To begin with, the court's instruction to disregard Scott-Jones testimony was inexcusably slow.  "Swiftness in judicial response is an important element in alleviating prejudice once the jury has been exposed to improper testimony."  *Sepulveda*, 15 F.3d at 1185.  However, the trial court's response to the jury's improper, extended exposure to Scott-Jones' perjurious, aborted testimony was anything but swift.  Not until the end of the day on May 1 – four days after he failed to return to court and eight days after his devastating testimony began – did the Court instruct the jury to disregard his testimony.  In the meantime, on the next business day after his disappearance, the court actually told the jurors that they *would* be allowed to

46

consider his testimony, subject only to some later limiting instruction.  Tr. 2316.
The court's confusing and inadequate response ensured that jurors absorbed and
remembered Scott-Jones' damaging testimony.

Carollo's prejudice was further compounded when the trial court denied
Carollo's request to instruct the jury to disregard the more-than-130 audio tapes
played during Scott-Jones' testimony, but precluded defense counsel from
defending against them.  Tr. 3200; 2702.   Scott-Jones' colorful interpretations of
scores of audio recordings typically echoed the government's theory of the case,
such as referral fees being disguised kickbacks or Carollo being the alleged
mastermind of the conspiracy.  Thus, when the government argued these same
points, it would have been all but impossible for the jury not to hark back to Scott-
Jones' provocative words on the witness stand and on scores of tapes.

Indeed, the inadequacy of the court's curative measures was apparent in the
jury's undeniable confusion regarding the status of the evidence concerning Mr.
Carollo.  On the first day of deliberations, the jury sent the court a note asking to
have "all admitted taped conversations involving D. Carollo" played back.  Tr.
3254.  On the second day, the jury asked again for the same set of admitted tapes
involving Carollo. Tr. 3269.  On both days, the court played for the jury the tapes
that it requested.  Nevertheless, on the third day of deliberations, the jury again
requested all Carollo tapes, but this time specified that it sought all "un-played"

47

tapes. A__ (Court Exhibit Z7 (Jury Note)); Tr. 3278.[6]  In writing this note, the jury clearly showed that it believed there were other Carollo tapes that were not replayed for them during the first two days of deliberation.  They also must have been discussing these tapes in the first instance to arrive at the request.  The only logical explanation for the note is that the jury remembered Carollo-related tapes involving Scott-Jones and wanted to hear them because they were never told the tapes were excluded.

The likelihood that Scott-Jones' words and tapes were ingrained in the jurors' memories and tainted the jury deliberations and verdict cannot be discounted.  The series of messages from the jury indicated that it viewed the issue of Mr. Carollo's guilt or innocence as a close question.[7]  The circumstances reinforce the conclusion that Scott-Jones' aborted testimony and the trial court's confounded response to that testimony likely made the difference between guilt and acquittal as to Mr. Carollo.

---

[6] The transcript mistakenly transcribed the jury's request for un-played tapes as "on played" tapes.  Tr. 3278.

[7] Indeed, the course of the jury's interactions with the court after hearing the Carollo tapes for the third time only makes this clearer.  That same afternoon, the jury sent a note to the court asking, "If there is a particular count for a specific defendant on which the jury cannot reach a unanimous decision, how do we indicate that (*i.e.*, acquittal) on the verdict sheet?" A__ (Court Exhibit Z11 (Jury Note)); and Tr. 3290.  The jury was sent back to deliberate.  The following afternoon it returned a guilty verdict.

The exposure of the jury to Scott-Jones' improper testimony and the trial court's inadequate remedial measures destroyed Mr. Carollo's chance for a fair trial. The district court abused its discretion by failing to declare a mistrial.

## <u>CONCLUSION</u>

For the foregoing reasons, the judgment of conviction should be reversed.

Respectfully submitted,

By: <u>/s/ Walter F. Timpone</u>

| | |
|---|---|
| JAMES R. SMART | WALTER F. TIMPONE |
| MCELROY, DEUTSCH, | MCELROY, DEUTSCH, |
| MULVANEY & CARPENTER LLP | MULVANEY & CARPENTER LLP |
| 30 JELLIFF LANE | 1300 Mt. Kemble Ave. |
| SOUTHPORT, CT 06890 | Morristown, NJ 07962 |
| (203) 319-4000 | (973) 993-8100 |

*Attorneys for Appellant Dominick P. Carollo*

Dated: February 8, 2013

49

## <u>CERTIFICATE OF COMPLIANCE</u>

1.  This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because this brief contains 11,424 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in Times New Roman 14-point font.

/s/ Walter F. Timpone
WALTER F. TIMPONE
MCELROY, DEUTSCH,
MULVANEY & CARPENTER LLP
1300 Mt. Kemble Ave.
Morristown, NJ 07962
(973) 993-8100

Dated:  February 8, 2013

STATE OF NEW YORK    )

                           )        ss.:        **AFFIDAVIT OF**

COUNTY OF NEW YORK  )                    **CM/ECF SERVICE**


      I, Maryna Sapyelkina, being duly sworn, depose and say that deponent is not a party to the action, is over 18 years of age.


      **On    February 8, 2013**


deponent served the within:  **Brief for Defendant-Appellant Dominick P. Carollo**


**upon:   See attached Service List**


via the CM/ECF Case Filing System. All counsel of record in this case are registered CM/ECF users. Filing and service were performed by direction of counsel.


**Sworn to before me on February 8, 2013**


/s/ Mariana Braylovskaya                          /s/ Maryna Sapyelkina

      **Mariana Braylovskaya**

Notary Public State of New York

No. 01BR6004935

Qualified in Richmond County

Commission Expires March 30, 2014


Job No. 245917

**Service List:**

James Joseph Fredricks
United States Department of Justice
*Attorneys for Appellee*
950 Pennsylvania Avenue, NW 3224
Washington, DC 20530
202-307-1403

Christopher Nicholas Manning
Williams & Connolly LLP
*Attorneys for Intervenors*
725 12th Street, NW
Washington, DC 20005
202-434-5121

Howard E. Heiss
O'Melveny & Myers LLP
*Attorneys for Defendant-Appellant Peter S. Grimm*
Times Square Tower
7 Times Square
New York, NY 10036
212-326-2116

John S. Siffert
Lankler Siffert & Wohl LLP
500 5th Avenue, 33rd Floor
New York NY 10110
212-921-8399

-and-

David Charles Frederick
Kellogg, Huber, Hansen, Todd, Evans & Figel, P.L.LC.
1615 M Street, NW, Suite 400
Washington DC 20036
202-326-7900

*Attorneys for Defendant-Appellant Steven E. Goldberg*