# 12-4310-cr(L)

## 12-4365-cr(CON), 12-4371-cr(CON)

———————————

**IN THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

———————————

UNITED STATES OF AMERICA,
*Appellee*,

v.

PETER S. GRIMM, DOMINICK P. CAROLLO, STEVEN E. GOLDBERG,
*Defendants-Appellants*,

and

UBS AG, UBS SECURITIES LLC, UBS FINANCIAL SERVICES, INC.,
*Intervenors.*

———————————

On Appeal from the United States District Court
for the Southern District of New York

———————————

**FINAL BRIEF OF APPELLANT STEVEN E. GOLDBERG**

———————————

JOHN S. SIFFERT
DANIEL M. GITNER
LANKLER SIFFERT & WOHL LLP
500 Fifth Avenue
New York, New York 10110
(212) 921-8399

DAVID C. FREDERICK
BRENDAN J. CRIMMINS
EMILY T.P. ROSEN
ANDREW E. GOLDSMITH
KELLOGG, HUBER, HANSEN, TODD,
  EVANS & FIGEL, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900

*Attorneys for Defendant-Appellant Steven E. Goldberg*

June 28, 2013

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ..................................................................................iv

JURISDICTIONAL STATEMENT ......................................................................1

ISSUES PRESENTED FOR REVIEW ................................................................1

STATEMENT OF THE CASE..............................................................................2

STATEMENT OF FACTS ....................................................................................4

    A.    Statutory Background...........................................................................4

    B.    The Charged Conspiracy ......................................................................6

    C.    The District Court's Denial Of Defendants' Motion To Dismiss The Indictment As Time-Barred ...............................................8

    D.    The Trial .............................................................................................10

        1.    Evidence regarding the charged conspiracy .............................10

        2.    One of the government's cooperating witnesses perjured himself, and Defendants were unable to complete their cross-examination of that witness....................11

        3.    The court's rulings on Defendants' requests for a mistrial ......................................................................................13

    E.    The Jury Instructions Regarding Overt Acts And The Statute Of Limitations .........................................................................16

    F.    The Post-Trial Ruling On The Statute-Of-Limitations Defense ...............................................................................................17

SUMMARY OF ARGUMENT ...........................................................................18

STANDARD OF REVIEW .................................................................................22

ARGUMENT .................................................................................................22

I.  THE EVIDENCE WAS INSUFFICIENT TO SHOW
    THAT A CONSPIRATOR COMMITTED AN OVERT
    ACT IN FURTHERANCE OF THE CONSPIRACY
    WITHIN THE LIMITATIONS PERIOD ...........................................22

    A.  The Interest Payments Are Not Overt Acts
        Because They Were Not Made By A Conspirator ..................23

    B.  The Interest Payments Were Not Within The
        Scope Of The Conspiracy ........................................................29

    C.  The Interest Payments Were Not Overt Acts In
        Furtherance Of The Conspiracy, But Rather Were
        The Results Of An Already-Completed Conspiracy ...............31

        1.  The interest payments were the results of a
            completed conspiracy .....................................................31

        2.  The cases on which the district court and
            government relied in treating the interest
            payments as overt acts do not support that
            conclusion ........................................................................36

    D.  Treating The Interest Payments As Overt Acts
        Would Disserve The Policies Underlying The
        Statutes Of Limitations ...........................................................40

II. THE DISTRICT COURT MISINSTRUCTED THE
    JURY REGARDING THE OVERT-ACT
    REQUIREMENT .................................................................................42

III. THE DISTRICT COURT ERRONEOUSLY DENIED
    GOLDBERG A MISTRIAL AND MISINSTRUCTED
    THE JURY AFTER EXCLUDING SCOTT-JONES'S
    EVIDENCE .........................................................................................44

    A.  The District Court Erroneously Denied Goldberg
        A Mistrial ................................................................................45

    B.  The Curative Instruction Was Untimely And
        Insufficient ..............................................................................52

IV.    THE EVIDENCE WAS INSUFFICIENT TO
ESTABLISH A WIRE-FRAUD CONSPIRACY ...............................57

V.    GOLDBERG JOINS IN THE ARGUMENTS OF
CAROLLO AND GRIMM ................................................................58

CONCLUSION ......................................................................................................58

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

Page

## CASES

*Adams v. Woods*, 6 U.S. (2 Cranch) 336 (1805).......................................40

*Braverman v. United States*, 317 U.S. 49 (1942) .....................................23

*Bridges v. United States*, 346 U.S. 209 (1953) ........................................40

*Bruton v. United States*, 391 U.S. 123 (1968) .........................................51

*Burks v. United States*, 437 U.S. 1 (1978) ................................................5

*Fiswick v. United States*, 329 U.S. 211 (1946)...................................31, 32

*Grunewald v. United States*, 353 U.S. 391 (1957) ........................6, 16, 29

*Holland v. Scully*, 797 F.2d 57 (2d Cir. 1986)..........................................52

*Howard v. Walker*, 406 F.3d 114 (2d Cir. 2005) ......................................52

*Ryan v. Miller*, 303 F.3d 231 (2d Cir. 2002) ............................................52

*Skilling v. United States*, 130 S. Ct. 2896 (2010) .....................................57

*Smith v. United States*, 133 S. Ct. 714 (2013) ..........................................22

*Toussie v. United States*, 397 U.S. 112 (1970) ...........................20, 40, 41

*United States v. A-A-A Elec. Co.*, 788 F.2d 242 (4th Cir. 1986) ........38, 39

*United States v. Anderson*, 326 F.3d 1319 (11th Cir. 2003)....................39

*United States v. Ben Zvi*, 242 F.3d 89 (2d Cir. 2001)...........23, 24, 25, 26

*United States v. Biaggi*, 909 F.2d 662 (2d Cir. 1990) ..............................46

*United States v. Borelli*, 336 F.2d 376 (2d Cir. 1964) ..............................42

*United States v. Bornman*, 559 F.3d 150 (3d Cir. 2009) ..........................31

*United States v. Carlo*, 507 F.3d 799 (2d Cir. 2007)................................57

*United States v. Carroll*, 26 F.3d 1380 (6th Cir. 1994)............................55

*United States v. Carson*, 52 F.3d 1173 (2d Cir. 1995) ............................................22

*United States v. Colon-Munoz*, 192 F.3d 210 (1st Cir. 1999) ................................33

*United States v. Danzey*, 594 F.2d 905 (2d Cir. 1979) ............................................52

*United States v. Detrich*, 865 F.2d 17 (2d Cir. 1988) ..............................................46

*United States v. Doherty*, 867 F.2d 47 (1st Cir. 1989) ...................9, 20, 21, 34, 35, 36, 37, 38, 39, 43

*United States v. Dynalectric Co.*, 859 F.2d 1559 (11th Cir. 1988) ..................38, 39

*United States v. Eppolito*, 543 F.3d 25 (2d Cir. 2008) ......................................22, 40

*United States v. Evans & Assocs. Constr. Co.*, 839 F.2d 656 (10th Cir. 1988) ........................................................................................38, 39

*United States v. Fuchs*, 218 F.3d 957 (9th Cir. 2000) ..............................................44

*United States v. Garber*, 471 F.2d 212 (5th Cir. 1972) ...........................................56

*United States v. Girard*, 744 F.2d 1170 (5th Cir. 1984)..........................................38

*United States v. Gonzalez*, 555 F.2d 308 (2d Cir. 1977) .........................................52

*United States v. Gullo*, 502 F.2d 759 (3d Cir. 1974)...............................................55

*United States v. Hare*, 618 F.2d 1085 (4th Cir. 1980)............................................33

*United States v. Harris*, 733 F.2d 994 (2d Cir. 1984) .............................................45

*United States v. Hassan*, 578 F.3d 108 (2d Cir. 2008) .......................................42, 43

*United States v. Hitt*, 249 F.3d 1010 (D.C. Cir. 2001) ............................................30

*United States v. Kissel*, 218 U.S. 601 (1910)...........................................................31

*United States v. Kohan*, 806 F.2d 18 (2d Cir. 1986) ...............................................45

*United States v. Kubrick*, 444 U.S. 111 (1979)........................................................41

*United States v. Lee*, 549 F.3d 84 (2d Cir. 2008) ...............................................51-52

*United States v. Lewis*, 67 F.3d 225 (9th Cir. 1995)................................................57

v

*United States v. Mennuti*, 679 F.2d 1032 (2d Cir. 1982)..........................................38

*United States v. Nazzaro*, 889 F.2d 1158 (1st Cir. 1989) ...................................35, 36

*United States v. Northern Imp. Co.*, 814 F.2d 540 (8th Cir. 1987) ..................38, 39

*United States v. Panhandle Trading, Inc.*, No. 5:05CR44 RSALL,
    2006 WL 1883436 (N.D. Fla. July 7, 2006)..............................................28

*United States v. Peters*, 732 F.2d 1004 (1st Cir. 1984) ...........................................28

*United States v. Reindeau*, 947 F.2d 32 (2d Cir. 1991) ...........................................45

*United States v. Roshko*, 969 F.2d 1 (2d Cir. 1992) .................................................31

*United States v. Sain*, 141 F.3d 463 (3d Cir. 1998) ................................................28

*United States v. Salmonese*, 352 F.3d 608 (2d Cir. 2003) ...........9, 20, 26, 36, 37, 39

*United States v. Sampol*, 636 F.2d 621 (D.C. Cir. 1980)........................................51

*United States v. Seifert*, 648 F.2d 557 (9th Cir. 1980)...........................................51

*United States v. Solivan*, 937 F.2d 1146 (6th Cir. 1991) ......................................55

*United States v. Spero*, 331 F.3d 57 (2d Cir. 2003)................................................40

*United States v. Szur*, 289 F.3d 200 (2d Cir. 2002) ...............................................57

*United States v. Walker*, 653 F.2d 1343 (9th Cir. 1981) ...................................38, 39

*United States v. Zauber*, 857 F.2d 137 (3d Cir. 1988)............................................57

*Wood v. Carpenter*, 101 U.S. 135 (1879) ...............................................................40

*Yates v. United States*, 354 U.S. 298 (1957)...........................................5, 31, 32, 44

*Zafiro v. United States*, 506 U.S. 534 (1993) ..........................................................45

## CONSTITUTION, STATUTES, AND RULES

U.S. Const.:

    Amend. V ............................................................................ 19, 30

    Amend. VI:

        Confrontation Clause ................................. 15, 21, 44, 51, 53

Sherman Act § 1, 15 U.S.C. § 1 ................................................... 39

18 U.S.C. § 201(g) (1982) ........................................................... 33

18 U.S.C. § 371 ............................................................... 2, 4, 5, 6

18 U.S.C. § 1343 ........................................................................... 4

18 U.S.C. § 3231 ........................................................................... 1

18 U.S.C. § 3282(a) ............................................................. 4, 5, 23

26 U.S.C. § 6531 ................................................................... 5, 23

26 U.S.C. § 6531(1) ..................................................................... 4

28 U.S.C. § 1291 ........................................................................... 1

Fed. R. App. P. 28(i) .................................................................. 58

Fed. R. Crim. P. 29 .................................................................... 18

## OTHER MATERIALS

Developments in the Law – Criminal Conspiracy, 72 Harv. L. Rev.
    922 (1959) ........................................................................... 5

## JURISDICTIONAL STATEMENT

The district court had subject-matter jurisdiction pursuant to 18 U.S.C. § 3231.  The court entered final judgment on October 25, 2012, and Goldberg timely appealed on October 26, 2012.  The court entered an amended judgment on November 5, 2012, and Goldberg timely appealed on November 13, 2012.  This Court has jurisdiction pursuant to 28 U.S.C. § 1291.

## ISSUES PRESENTED FOR REVIEW

1.    Did the district court correctly conclude that the government presented sufficient evidence of an overt act in furtherance of the charged conspiracy within the limitations period, even though all of the allegedly fraudulent bidding conduct occurred outside the limitations period?

2.    Did the district court's instructions require the jury to find that an overt act in furtherance of the conspiracy had occurred within the limitations period?

3.    Did the district court err in denying Goldberg's motion for mistrial?

4.    Did the district court err by failing promptly and properly to instruct the jury regarding the testimony of one of the government's cooperating witnesses, who committed perjury and then failed to return to court to complete his testimony?

5.    Can the right to control one's assets be considered property under the wire-fraud statute?

## STATEMENT OF THE CASE

This appeal arises from a judgment of conviction in the U.S. District Court for the Southern District of New York (Baer, J.).  On July 27, 2010, the government indicted Steven Goldberg and his co-defendants Dominick Carollo and Peter Grimm ("Defendants").  The indictment alleged that Defendants conspired in violation of 18 U.S.C. § 371 to commit wire fraud and to defraud the Internal Revenue Service ("IRS") by participating in a scheme to bid for and win contracts known as guaranteed investment contracts ("GICs") from municipal bond issuers at artificially determined or suppressed rates.

Defendants moved to dismiss the indictment, explaining that the conspiracy charges were time-barred because they required proof of an overt act in furtherance of the conspiracy within the limitations period, and all of the GICs alleged in the indictment were auctioned, awarded, and entered into outside of the limitations period.  The government maintained that interest payments made to the issuers by other entities pursuant to terms set in the GICs constituted overt acts within the limitations period.  Defendants contended that the conspiracy was complete when the GICs were awarded and entered into and that the interest payments were merely the results of the completed conspiracy.  The district court denied the motion as to the conspiracy counts, finding that the aim of the conspiracies was "economic benefit" and that the payments were overt acts in furtherance.  *United*

*States v. Carollo*, No. 10 CR 654(HB), 2011 WL 3875322 (Aug. 25, 2011)

(DN 53, at 5) (SPA5).

At trial, the evidence confirmed that the only conduct that occurred within the limitations period were the interest payments, which Defendants had no role in making and which were made as part of an automated, back-office function pursuant to the GICs. In addition, the government introduced numerous recordings of telephone calls through its main cooperating witness, Adrian Scott-Jones. Goldberg cross-examined Scott-Jones, introducing recordings that showed Goldberg's innocent state of mind and demonstrating that Scott-Jones had perjured himself. On April 27, 2012, following the conclusion of Goldberg's cross-examination, the court broke for lunch, and Scott-Jones failed to return for his cross-examination by the other Defendants. The government announced that he had tried to kill himself and would not return. The court denied Defendants' requests for a mistrial. On May 1, the court instructed the jury to disregard Scott-Jones's testimony, and the following day it granted Carollo's and Grimm's request, over Goldberg's objection, to strike all of the evidence introduced through Scott-Jones, including the exculpatory tapes that Goldberg had introduced.

At the trial's conclusion, the court instructed the jury that an "overt act" could be anything undertaken "to advance an objective of the conspiracy." Tr. 3235 (SPA17). The court denied Goldberg's objection to the charge and

3

Defendants' proposed charge, which would have instructed the jury that an overt act requires the conspirators' continuous cooperation and cannot be merely the incidental result of the completed conspiracy.

The jury convicted Defendants. After the trial, Defendants renewed their statute-of-limitations argument in a motion for acquittal, arguing that the interest payments were not overt acts in furtherance of the conspiracy because they were not made by a conspirator and were the results of an already-completed conspiracy. The district court denied the motion at Defendants' sentencing hearing, reasoning that the goal of the conspiracies was economic benefit and that Defendants "were in receipt of that economic benefit while they held the issuers' money and paid suppressed interest payments." Sentencing Tr. 11 (SPA21).

## STATEMENT OF FACTS

### A.    Statutory Background

Goldberg was charged under the general federal conspiracy statute, 18 U.S.C. § 371, with conspiring both to defraud municipalities in violation of 18 U.S.C. § 1343 (the statute prohibiting wire fraud) and to defraud the IRS. The statute of limitations for wire-fraud conspiracies is provided by the general five-year criminal statute of limitations. *See* 18 U.S.C. § 3282(a). The limitations period for conspiracies to defraud the IRS is six years. *See* 26 U.S.C. § 6531(1).

4

Both statutes of limitations provide that the limitations period begins when the "offense" is "committed."  *See* 18 U.S.C. § 3282(a); 26 U.S.C. § 6531.  At common law, "the crime of conspiracy was indictable upon the formation of the agreement."  Developments in the Law – Criminal Conspiracy, 72 Harv. L. Rev. 922, 945 (1959).  However, § 371 requires an overt act for the crime to be indictable.  *See* 18 U.S.C. § 371 (requiring proof that a conspirator performed "any act to effect the object of the conspiracy").

"The function of the overt act in a conspiracy prosecution is simply to manifest that the conspiracy is at work, and is neither a project still resting solely in the minds of the conspirators nor a fully completed operation no longer in existence."  *Yates v. United States*, 354 U.S. 298, 334 (1957) (internal quotations and citation omitted), *overruled in part on other grounds by Burks v. United States*, 437 U.S. 1 (1978).  Because the crime of conspiracy is complete once there is an agreement and (where required) an overt act, "the courts originally took the view that the statute [of limitations] began to run at that time."  Developments in the Law – Criminal Conspiracy, 72 Harv. L. Rev. at 960.  Under the modern approach, however, the limitations period for a conspiracy with an overt-act requirement is renewed with each overt act, such that a prosecution is timely if a member of the conspiracy commits at least one overt act in furtherance of the conspiracy within

5

the limitations period. *See Grunewald v. United States*, 353 U.S. 391, 396-97 (1957).

**B.    The Charged Conspiracy**

The operative indictment charged Goldberg and his co-defendants Grimm and Carollo on six counts, all alleging conspiracies in violation of § 371, with the same two objects charged in the original indictment:  wire fraud and defrauding the IRS.  Superseding Indictment ¶¶ 18, 26, 34, 43, 53, 60 (A178-79, A185-86, A192, A199, A206, A212-13).  Each count alleged the same method of satisfying these objects:  "a scheme to deprive municipal issuers of money by causing them to award investment agreements and other municipal finance contracts at artificially determined or suppressed rates, and to deprive the municipal issuers of the property right to control their assets by causing them to make economic decisions based on false and misleading information."  *Id.* ¶¶ 19, 27, 35, 44, 54, 61 (A179, A186, A193, A200, A206-07, A213).

The "investment agreements" referred to in the indictment are known as guaranteed investment contracts, or GICs.  According to the superseding indictment, government entities use GICs to invest the proceeds of a municipal bond offering until those funds are needed for the project that was the subject of the bond offering.  *Id.* ¶ 10 (A176).  In a GIC, a financial institution serves as the municipality's counterparty, and it pays interest on the invested funds to the

6

municipality. *Id.* ¶ 16 (A178). GICs are arranged by brokers, which hold auctions in which financial institutions bid for the right to enter GICs with bond-issuing entities. *Id.* ¶¶ 11-13 (A176-77).

Goldberg and the other Defendants worked in the front office of a financial institution that participated in GIC auctions. *Id.* ¶¶ 3-5 (A174). Defendants' role was to put together bids for GICs and to interface with the brokers that administered the GIC auctions. *Id.* ¶¶ 3-5, 13 (A174, A177). The superseding indictment alleged that Defendants obtained information about their competitors' bids from the brokers and used that information to win GIC auctions on more profitable terms than otherwise could have occurred. *Id.* ¶ 21 (A180-82). The superseding indictment did not allege that Defendants played any role in administering the GICs after those agreements were executed, and the evidence at trial confirmed that they did not do so. Tr. 2741, 2746-47, 2785 (A937, A939, A947).

The superseding indictment charged Goldberg with engaging in five conspiracies, the earliest of which began in August 1999. Superseding Indictment ¶¶ 18, 34 (A178, A192). Although the indictment did not allege any misconduct by Defendants within the six years preceding the filing of the original indictment, both indictments asserted – without elaboration – that all five offenses continued until "at least November 2006." *Id.* ¶¶ 18, 26, 34, 53, 60 (A178, A185, A192,

7

A206, A212).  Counts 1, 2, and 3 charged Defendants with conspiracies involving

transactions between their employer GE Capital and brokers Chambers Dunhill

Rubin & Co. ("CDR"), IMAGE, and Tradition North America, Inc. ("Tradition"),

respectively.  *Id.* ¶¶ 18, 26, 34 (A178-79, A185-86, A192); Bill of Particulars (Oct.

14, 2011) (A266-68).  Counts 5 and 6 charged Goldberg with conspiracies

involving transactions between his subsequent employer Financial Security

Assurance ("FSA") and CDR and IMAGE, respectively.  Superseding Indictment

¶¶ 53, 60 (A206, A212-13); Bill of Particulars (A270-71).[1]

## C.    The District Court's Denial Of Defendants' Motion To Dismiss The Indictment As Time-Barred

Because the indictment failed to allege that an auction occurred or a GIC

was executed within the limitations period, Defendants moved to dismiss the

indictment as barred by the applicable statutes of limitations.  Defendants noted

that the only conduct alleged in the indictment within the limitations period

consisted of "required, back-office interest payments" made by non-party financial

institutions pursuant to the GICs.  DN 39, at 1.

The court denied Defendants' motion.  Although the conspirators were not

alleged to have *received* any payments within the limitations period, the court

---

[1] Count 4 charged Grimm with a conspiracy involving transactions between GE Capital and broker UBS.  Superseding Indictment ¶ 43 (A199); Bill of Particulars (A269).

8

relied on *United States v. Salmonese*, 352 F.3d 608 (2d Cir. 2003), which it

described as holding that "a conspirator's *receipt* of anticipated profits from the

fraudulent sales of financial instruments" was an "'overt act in furtherance of an

economically-motivated conspiracy.'" DN 53, at 4 (SPA4) (quoting 352 F.3d at

616) (emphasis added). The court acknowledged that the *Salmonese* court, relying

on *United States v. Doherty*, 867 F.2d 47 (1st Cir. 1989) (Breyer, J.), had

recognized that even the "receipt" of an "economic benefit" following a completed

transaction is not an "overt act" that restarts the limitations period "where the

economic benefit may be too attenuated relative to the aim of the central

conspiracy." DN 53, at 4 (SPA4). The court nonetheless concluded that the

interest payments here were properly considered overt acts within the limitations

period. The court characterized the alleged scheme as an "effort[ ] by Defendants

to profit through paying artificially lowered interest rates," and thus reasoned that

this case was "closer to the scheme in *Salmonese* to fraudulently sell financial

instruments and incur economic gain" because the "central aim of the conspiracies

is economic benefit and the subsequent payments represent a definite series of acts

in furtherance of those conspiracies." *Id.* at 5 (SPA5). The court therefore

concluded that "the payment of artificially depressed interest payments" by non-

parties "constitutes overt acts in furtherance of the conspiracies" and allowed the

counts to proceed to trial. *Id.*

**D.    The Trial**

**1.    Evidence regarding the charged conspiracy**

At trial, the government's cooperating witnesses testified that brokers, including CDR, IMAGE, and UBS, solicited bids for the GICs from entities known as GIC providers.  Tr. 327, 480, 2190, 2265, 2740 (A379, A414, A834, A843, A937).

Goldberg and Grimm worked on behalf of GIC providers, submitting bids for GICs to the brokers, and Carollo was their supervisor at GE.  *E.g.*, Tr. 341 (A383).  After leaving GE, Goldberg worked for its competitor, FSA.  The government's cooperating witnesses – who were current and former employees of the brokers – testified that the brokers improperly provided Defendants with information about other providers' bids.  *E.g.*, Tr. 339 (A382).  Sometimes this information allowed Defendants to reduce the interest rate they bid and still win the auction, and sometimes the information prompted Defendants to increase their bids to win.  *E.g.*, GX-605191 (A1282-88); Tr. 1325-27 (A620-21).  Although cooperating witnesses generically referred to "FSA" as a provider, FSA Capital Management Services and FSA Capital Markets Services bid on GIC contracts, while a different company – FSA Asset Management – made interest payments to municipalities.  Tr. 2742-43 (A938).

10

After GICs were signed, their terms were entered into computer systems that calculated the proper interest payments. *See* Tr. 2744 (A938) (FSA Asset Management), 2781 (A946) (FGIC, Trinity Funding, and Trinity Plus), 2784 (A947) (FGIC, Trinity Funding, and Trinity Plus). Goldberg and the other Defendants had nothing to do with making the interest payments at GE or FSA. Tr. 2785 (A947) (FGIC, Trinity Funding, and Trinity Plus); *see also* Tr. 2741, 2746-47 (A937, A939) (similar testimony regarding FSA Asset Management). That payment process was an automated, back-office function, *see* Tr. 2743-47 (A938-39), which (as noted) was performed by separate legal entities.

### 2.    One of the government's cooperating witnesses perjured himself, and Defendants were unable to complete their cross-examination of that witness

At trial, the jury heard twelve-and-a-half days of evidence. *See* Tr. 326, 2842 (A379, A956.2). The earliest conduct charged in the indictment – including evidence of the formation of any conspiracy and the evolution of Goldberg's state of mind – was offered through Adrian Scott-Jones. Superseding Indictment ¶¶ 18, 34 (A178-79, A192); G-129781 (A1123-25) (tape dated September 8, 1999, introduced by government through Scott-Jones); G-130727 (A1131-34) (tape dated August 30, 1999). Scott-Jones's direct examination on April 24 and 25 consumed 146 transcript pages – more than any other government witness – and introduced 134 tapes.

11

Cross-examination by Goldberg began on April 25 and continued for approximately eight hours on April 26 and 27.[2]  During cross-examination, Goldberg introduced tape-recorded conversations between Goldberg and Scott-Jones showing Goldberg's innocent intent when he made payments to Scott-Jones.[3]  Those tapes showed that Goldberg was trying to negotiate a consulting agreement between GE and Scott-Jones, where GE would pay for introductions to new issuers; that Goldberg agreed that he was not paying to win GICs; and that Goldberg sought advice from GE's legal department about the proposed payment agreement.

On April 26, Scott-Jones testified on cross-examination that the government had not prepared him for his testimony, Tr. 2057 (A801), and the following day he admitted that he had lied about his preparation, Tr. 2085 (A808). The court concluded that Scott-Jones's testimony on this topic was perjurious.  Tr. 2693 (SPA10).

Goldberg concluded his cross-examination of Scott-Jones before lunch on April 27.  Tr. 2178-79 (A831-32).  Before doing so, Goldberg ceded

---

[2] Tr. 2545 (SPA9) (district court noting length of cross-examination).

[3] Tr. 1930 (A769) (SGX-413043), 1941-47 (A772-73) (SGX-603652, SGX-412739, SGX-413223, SGX-578837), 1957-67 (A776-78) (SGX-146399, SGX-146403, SGX-147696, SGX-147589, SGX-148433), 1976 (A780) (SGX-148813), 1988 (A783) (SGX-602370), 2001-02 (A787) (SGX-146966, incorrectly identified as SGX-146996).

cross-examination on topics relevant to him to Grimm and Carollo, including planned cross-examination regarding aspects of Scott-Jones's testimony that would undermine Scott-Jones's credibility about certain bidding conduct and the alleged formation of the conspiracy.  Tr. 2312, 2585-86 (SPA7, A912).

Scott-Jones failed to return from lunch, and at the end of the day the government announced that he had tried to kill himself.  Tr. 2304 (A854).  On Saturday, April 28, the government informed the court that Scott-Jones would not return to court to complete his testimony.  *See* E-mail from A. Hill to Law Clerk (Apr. 28, 2012) (A333).

### 3. The court's rulings on Defendants' requests for a mistrial

Following Scott-Jones's failure to complete his testimony, Defendants each separately moved for a mistrial and requested, in the alternative, dismissal of Count 3, for which Scott-Jones was the primary witness.[4]  Carollo also requested, if a mistrial were denied, that the district court strike Scott-Jones's testimony and the exhibits that had been admitted through him, including all taped evidence.[5]

---

[4] *See* Letter from J. Siffert to Hon. H. Baer 2 (Apr. 29, 2012) (A337); Letter from H. Heiss to Hon. H. Baer 3 (Apr. 30, 2012) (A357); Letter from W. Timpone to Hon. H. Baer 5 (Apr. 30, 2012) (A349).

[5] *See* Letter from W. Timpone to Hon. H. Baer 5-6 (Apr. 30, 2012) (A349-50).

The government argued that a mistrial was unnecessary and, after initially resisting, requested that the court strike Scott-Jones's testimony but save Count 3.[6]

On Monday, April 30, the district court summarily denied the mistrial motions. Tr. 2310 (SPA7). It did not, however, immediately rule on the requests to strike Scott-Jones's testimony and to dismiss (or save) Count 3. Instead, it told the jurors that they would be allowed to consider Scott-Jones's testimony subject to cautionary instructions that it would give later. Tr. 2316 (SPA8). At the end of the day on Tuesday, May 1, the district court finally instructed the jury to disregard Scott-Jones's *testimony*, but it still did not address *the tapes* (or other exhibits) that had been admitted through him. Tr. 2693-94 (SPA10). The following morning, outside the presence of the jury, the court dismissed Count 3 and granted Carollo's motion to strike all evidence admitted through Scott-Jones. Tr. 2701-02 (SPA11-12).

Goldberg promptly objected to the ruling striking all of the Scott-Jones tapes, arguing that certain recorded conversations admitted through Scott-Jones were essential to Goldberg's innocent-state-of-mind defense and that he would have offered those tapes regardless of whether Count 3 had been brought. Tr. 2707-09 (SPA13). Grimm and Carollo disagreed, asserting that the court was correct in striking all of the evidence because their inability to cross-examine

---

[6] *See* Letter from A. Hill to Hon. H. Baer (Apr. 29, 2012) (A340-44).

Scott-Jones violated their Confrontation Clause rights.  Tr. 2709-10 (A932-33).

The district court noted the disagreement between Goldberg, on the one hand, and

Grimm and Carollo, on the other, over admission of the tapes.  Tr. 2710 (A933).

The court admitted that it was "plagued" by Goldberg's concern about the loss of

exculpatory evidence, but nonetheless adhered to its decision to exclude all of the

Scott-Jones tapes.  Tr. 2708 (SPA13).

 The government later re-offered one recorded conversation that had been

admitted through Scott-Jones.  Tr. 2822-23 (A954).  Goldberg argued that, if the

court were to admit that recording, it should re-admit other recordings as well.  Tr.

2824-25 (A954).  Carollo objected to the re-admission of any recordings under any

circumstances.  Tr. 2827 (A955).  The court did not admit the recording.  Tr. 2958

(A961).[7]

 Although, on May 2, the district court had directed counsel outside the jury's

presence that it was striking the Scott-Jones evidence, and not to refer to Scott-

Jones in any fashion, Tr. 2702 (SPA12), the court never instructed the jury to

disregard the exhibits admitted during Scott-Jones's testimony.  The court also

---

 [7] The exculpatory tapes were not the only defense evidence of innocent
intent that the district court excluded.  The court also excluded Goldberg's
personnel records from FSA, which proved that Goldberg did not hide his conduct
from his superiors, establishing that Goldberg believed the conduct was lawful.
Tr. 2806-07, 2828-29 (A952, A955).

declined Defendants' request to include an instruction in the jury charge to

disregard the Scott-Jones testimony and evidence.  Tr. 3200 (SPA14).[8]

## E.    The Jury Instructions Regarding Overt Acts And The Statute Of Limitations

Because the first indictment in the case was filed on July 27, 2010, the

government was required to prove that at least one overt act in furtherance of the

conspiracy was performed after July 27, 2005 (with respect to wire-fraud

conspiracy), or July 27, 2004 (with respect to IRS conspiracy).  *See Grunewald*,

353 U.S. at 396-97.  At the charge conference, Goldberg objected to the district

court's proposed instruction regarding the requirement that an overt act be "in

furtherance" of the charged conspiracy.  Goldberg explained that "[t]he problem

with the overt act charge" is that "[i]t doesn't define what 'in furtherance' is in a

way that balances and informs the jury.  It says it has to be in furtherance of it and

then it just says that it can be anything."  Tr. 2945 (A959).  Goldberg argued that

an overt act must "be something that's not a result of a completed conspiracy," but

rather involves "continuous cooperation of the alleged coconspirators."  *Id.*

Defendants proposed an instruction that required the jury to make the necessary

finding that an overt act in furtherance of the conspiracy was committed within the

limitations period.  *See* Defs.' Proposed Supp. Charge at 2 (A361) ("[a]n act is not

---

[8] The court did instruct the jurors at the end of its charge to tear out of their notebooks any reference to Count 3, because the court had "stricken the count and the testimony."  Tr. 3244 (A1031).

16

'in furtherance of' a conspiracy if it is an incidental result of the completed conspiracy"; overt acts "require the continuous cooperation of the alleged conspirators in order to be executed" or must be "accompanied by continued concerted activity and group association for criminal purposes by the alleged conspirators," and if those conditions are not satisfied "and the act instead consisted of ordinary, typically non-criminal, unilateral actions, then the act is *not* in furtherance of an ongoing conspiracy and is merely the result of a completed conspiracy").

The court rejected Defendants' requested instruction.  The court instead instructed the jury that, "to convict the defendant on the count you are considering, you must find that the government has proven beyond a reasonable doubt that a co-conspirator engaged in the specific act in furtherance of the conspiracy within the applicable statute of limitations."  Tr. 3235 (SPA17).  The only guidance given to the jury regarding the "in furtherance" requirement was that "[a]n overt act was 'in furtherance' of a conspiracy if the act was undertaken in order to advance an objective of the conspiracy."  *Id.*

## F.    The Post-Trial Ruling On The Statute-Of-Limitations Defense

All of the GIC auctions discussed at trial occurred before July 27, 2004 – i.e., more than six years before the indictment.  The only events that occurred after July 27, 2004, were a handful of interest payments made pursuant to the GICs

17

entered into at the time of the auctions.  For example, in support of Count 2, the government introduced evidence that Trinity Plus made interest payments on June 30, 2006, pursuant to two GICs.  Tr. 2772 (A944); G-71-16 (A1453); G-71-21, at 2 (A1455).  One of these GICs was executed on July 1, 2002, and is scheduled to run until January 1, 2033, and the other began on January 1, 2003, and is scheduled to run until January 1, 2034.  *See* G-20-1, at 5 (A1376); G-21-1, at 3 (A1383). Trinity Plus will continue to make interest payments every six months throughout the life of each GIC.  *See* G-20-1, at 5 (A1376); G-21-1, at 3 (A1383).

Defendants renewed their statute-of-limitations argument in a post-trial Rule 29 motion for acquittal, which the court denied at the sentencing hearing. Stating that it had "not changed [its] position from last year," Sentencing Tr. 10 (SPA20), the court reasoned that "[t]he fraud ends not when the GIC is won or completed but when the economic benefits of the fraudulent GIC [are] no longer held by the conspirators."  *Id.* at 11 (SPA21).

## SUMMARY OF ARGUMENT

**I.**     The only conduct alleged and proved to have occurred within the limitations period were interest payments made pursuant to GICs.  The interest payments are not overt acts in furtherance of the conspiracy, and the prosecution is therefore time-barred.

18

**A.**    An overt act must be committed by a defendant or co-conspirator. The entities that made the interest payments – FGIC, Trinity, Trinity Plus, and FSA Asset Management – were neither.  The government's argument that Defendants knew about the payments, or participated in acts that eventually resulted in the payments, cannot make the interest payments the affirmative acts *of Defendants*.

Nor were the interest-paying entities co-conspirators.  The government introduced no evidence of these entities' separate culpability; the only argument the government made for finding these entities co-conspirators was premised on *respondeat superior*.  But a corporation can conspire only through its agents, and the interest-paying entities in this case thus cannot be conspirators separate from the individual Defendants.

**B.**    In addition, the interest payments were not overt acts because they were not within the scope of the charged conspiracy.  The government charged and prosecuted this case as a conspiracy to obtain GICs.  That entire process was completed outside of the limitations period.  In describing the scheme as one for "economic benefit" in which the goal was not just to obtain GICs, but to hold and use the money from the GICs by paying suppressed interest rates, the government and district court constructively amended the indictment in violation of the Fifth Amendment.

19

**C.**     Even if the interest payments had been made by a conspirator and even if the government had charged in the indictment that the payments were within the scope of the conspiracy, those repayments from a lone conspirator back to the putative victim could not be within the scope of a conspiracy to defraud but rather are merely results of the completed conspiracy.  Where payments "merely consist[ ] of a lengthy, indefinite series of ordinary, typically noncriminal, unilateral actions, . . . *and* there is no evidence that any concerted activity posing the special societal dangers of conspiracy is still taking place," the payments constitute "merely . . . the 'result' of the conspiracy."  *Doherty*, 867 F.2d at 61.  The court's contrary conclusion relies on *Salmonese*, but that case, along with the other cases the government cited, involved schemes of short duration or otherwise required continuous cooperation from the conspirators.

**D.**     Statutes of limitations protect defendants from charges based on events from the long-distant past and encourage law enforcement to pursue suspected criminal activity promptly.  *See Toussie v. United States*, 397 U.S. 112, 114-15 (1970).  The government could have indicted Defendants much earlier than July 2010.  Allowing each interest payment to extend the limitations period, where the payments are still being made and one GIC is scheduled to pay interest until 2034, rewards the government's delay and undermines the important purposes of criminal statutes of limitations.

**II.**     The court instructed the jury that an act was "in furtherance" of the conspiracy if it was undertaken "to advance an objective of the conspiracy."  Tr. 3235 (SPA17).  That instruction misstated the law:  routine acts that continue long after the commission of the underlying misconduct are "merely . . . the 'result' of the conspiracy" and thus do not "count as . . . 'overt act[s]' for statute of limitations purposes."  *Doherty*, 867 F.2d at 61.  The government cannot show that a properly instructed jury would have found the interest payments to be overt acts in furtherance of the conspiracy.

**III.**     The court erroneously refused to grant Goldberg a mistrial when it chose to exclude the evidence admitted through Scott-Jones.  Excluding that evidence to vindicate Defendants' Confrontation Clause rights denied Goldberg the right to present his defense.  The court also erred by providing an untimely and inadequate instruction to the jury regarding Scott-Jones's testimony and the evidence introduced through him; under the extraordinary circumstances a new trial is required.

**IV.**     The government charged that the conspiracy deprived the issuers of the "property" right to control their assets.  Although in this Circuit the right to control one's assets is considered "property," that position is incorrect and in conflict with the law of other circuits.

## STANDARD OF REVIEW

This Court "review[s] the grant or denial of a judgment of acquittal under Rule 29 *de novo*," and "[t]he test for sufficiency" is "whether a rational jury could conclude beyond a reasonable doubt that a defendant is guilty of the crime charged." *United States v. Eppolito*, 543 F.3d 25, 45 (2d Cir. 2008) (internal quotations omitted).[9]

This Court reviews the denial of a motion for mistrial for abuse of discretion. *See United States v. Carson*, 52 F.3d 1173, 1188 (2d Cir. 1995).

## ARGUMENT

## I. THE EVIDENCE WAS INSUFFICIENT TO SHOW THAT A CONSPIRATOR COMMITTED AN OVERT ACT IN FURTHERANCE OF THE CONSPIRACY WITHIN THE LIMITATIONS PERIOD

The last GIC auction discussed at trial occurred on May 20, 2004. Tr. 941 (A526). The government neither alleged in the indictment, nor submitted evidence at trial of, any GIC auction occurring within the applicable limitations periods. Nor did the government offer any explanation for its failure to act for more than six years after the last transaction, let alone seek to establish a basis for tolling the

---

[9] Although commission of the crime of conspiracy within the limitations period is "not an element of the conspiracy offense," "the Government must prove the time of the conspiracy offense if a statute-of-limitations defense is raised." *Smith v. United States*, 133 S. Ct. 714, 720, 721 (2013).

statutes of limitations.  Accordingly, under a straightforward application of 18

U.S.C. § 3282(a) and 26 U.S.C. § 6531, this prosecution was time-barred.

But the government contended below, and the district court agreed, that each

interest payment made pursuant to the GICs constituted a new "overt act" in

furtherance of the conspiracy.  That attempt to evade the statute of limitations fails

for multiple independent reasons.  The interest payments were not overt acts

because they were not made by any co-conspirator and were not within the scope

of the conspiracy alleged in the indictment.  The interest payments were, at most,

merely the results of a completed conspiracy and could not extend the life of the

conspiracy.

### A.    The Interest Payments Are Not Overt Acts Because They Were Not Made By A Conspirator

"To constitute an overt act for purposes of the statute of limitations the act

must involve some affirmative conduct or deliberate omission *on the part of [the*

*defendant] or her coconspirators*."  *United States v. Ben Zvi*, 242 F.3d 89, 97 (2d

Cir. 2001) (emphasis added); *see also Braverman v. United States*, 317 U.S. 49, 53

(1942) ("The gist of the crime of conspiracy as defined by the statute is the

agreement or confederation *of the conspirators* to commit one or more unlawful

acts where one or more *of such parties* do any act to effect the object of the

conspiracy.") (internal quotations omitted; emphases added); Tr. 3234 (SPA17)

(district court's instruction to jury:  "The third element that the government must

23

prove beyond a reasonable doubt is that *one of the members of the conspiracy* knowingly committed at least one overt act charged in the count you are considering in furtherance of the conspiracy you are considering.") (emphasis added).

The alleged "overt acts" here – the interest payments – were made by FGIC, Trinity, Trinity Plus, and FSA Asset Management.  Tr. 341, 2742-43 (A383, A938).  Those entities were neither defendants nor co-conspirators.

*First*, none of the interest-paying entities was named as a defendant in the indictment.  Superseding Indictment ¶ 1 (A173).  Although the government has not disputed that Defendants did not personally make the payments, *see* DN 255, at 29-30, it has strained to argue that the interest payments should somehow be attributed to Defendants because Defendants "knew the payments were part of the conspiracy's illegal purpose" and "knew their employer was making those payments."[10]  But knowing about those acts, or even participating in the successful bids that resulted in them, does not make the payments acts *of Defendants*, as required to make them overt acts.  *See Ben Zvi*, 242 F.3d at 97.

*Ben Zvi* is dispositive on this point.  There, the defendant staged a robbery of her jewelry store and then submitted a claim for the loss to her insurer, Lloyd's of

---

[10] Opp. of Appellee United States to Defs.' Joint Emergency Mot. for Release Pending Appeal at 19, Nos. 12-4310 et al. (Nov. 8, 2012) ("Bail Opp.").

London. *Id*. at 93. The government argued that the wire transfer of money from Lloyd's to its attorney in New York was an overt act within the statute of limitations on the charged wire-fraud conspiracy because, without the defendant's conduct, Lloyd's would not have made the transfer. *Id*. at 97. This Court rejected that argument, holding that an overt act "for purposes of the statute of limitations . . . must involve some affirmative conduct or deliberate omission on the part of [the defendant] or her coconspirators." *Id.* The wire transfer by Lloyd's, even though "precipitated by earlier fraudulent acts and omissions of defendant and her coconspirators, did not involve or otherwise turn on any identifiable act or omission of the conspirators as of the time of the wire transfer." *Id.*[11]

That principle applies here. Like the wire transfer in *Ben Zvi*, the interest payments were made by non-parties and "did not involve or otherwise turn on any identifiable act or omission of the conspirators as of the time of the [interest payments]." *Id.* Thus, the fact that Defendants' earlier actions may have precipitated the interest payments (or, even more attenuated, that Defendants believed those payments would be made in the future) cannot make the payments *Defendants'* overt acts.

_____

[11] The *Ben Zvi* Court also held that a wire-fraud conspiracy count in a superseding indictment was timely because it properly alleged that the defendant's *receipt* of the insurance proceeds occurred within the limitations period. 242 F.3d at 98. That holding has no application here, because there is no dispute that none of the Defendants received any of the interest payments.

*Salmonese* is inapposite. There, as in *Ben Zvi*, *see supra* note 11, the Court "h[e]ld that *a conspirator's* knowing *receipt* of criminal proceeds achieved passively through a wire transfer into an account under his control can satisfy the overt act element of conspiracy." 352 F.3d at 618 (emphases added). The Court saw no reason to distinguish between a defendant's receipt of proceeds personally or through a clerical employee, so long as the defendant knowingly and intentionally received the proceeds, *id.*, but it was still *the defendant's act of receiving the proceeds* that was the overt act, *id.* at 617 n.3 (emphasizing that, in *Ben Zvi*, "it was precisely because the . . . conspirators' knowing receipt of proceeds was *their* act – separate and distinct from the lawyer's drawing of the check – that the court held that the overt act requirement was satisfied"). Here, the alleged victims – not Defendants – received the interest payments.

The government cannot avoid the binding force of *Ben Zvi* by arguing that Defendants are "responsible for causing such payments to be made." DN 255, at 31. The government introduced no evidence that Defendants controlled the interest-paying entities or were in any way responsible for their actions. In addition, Goldberg and Carollo stopped working for GE Capital before the limitations period. Tr. 1527 (A671) (Goldberg left GE Capital in May 2001), 1619 (A692) (Carollo left GE Capital on approximately November 8, 2002). And Goldberg's activity had no connection with the payment of interest by FSA Asset

Management.  There is simply no basis for attributing the interest-payment actions to Defendants.

*Second*, the interest-paying entities were not co-conspirators.  With respect to Counts 5 and 6, Goldberg bid for GICs on behalf of FSA Capital Management Services and FSA Capital Markets Services.  Tr. 2742 (A938).  But a different company, FSA Asset Management, made the interest payments to issuers required by the GICs they signed.  Tr. 2743 (A938).  FSA Asset Management therefore cannot be a co-conspirator, and its acts cannot extend the statute of limitations.

With respect to Counts 1 and 2, the interest-paying entities – FGIC, Trinity, and Trinity Plus – also were not co-conspirators.  The government argued before the district court that these entities were co-conspirators "because their culpable agents – Grimm, Goldberg, and Carollo – knew that the payments were part of the conspiracy's illegal purpose even if the payments were made by a clerical employee, account, or direct deposit."  DN 255, at 30.  Thus, the government's theory is that, under the doctrine of *respondeat superior*, the entities were members of the conspiracy by virtue of an alleged agency relationship with the individual Defendants.  The government introduced no evidence suggesting that FGIC, Trinity, or Trinity Plus were independent conspirators bearing criminal liability *separate* from that of Defendants.  Nor did the government allege, much less prove, that any individual associated with any interest-paying entity other than the

27

individual Defendants had the requisite *mens rea* to commit a crime.  Indeed, the government argued to the jury that Goldberg hid his conduct from others at FSA, Tr. 2985 (A966); it cannot now claim that the individuals responsible for the interest payments were involved in the conspiracy.

The government's theory fails because the entities here cannot be deemed co-conspirators based solely on the individual Defendants' actions.  A "corporation is a conspirator only pursuant to respondeat superior liability."  *United States v. Sain*, 141 F.3d 463, 475 (3d Cir. 1998).  But "[a] corporate officer, acting *alone* on behalf of the corporation, [cannot] be convicted of conspiring with the corporation."  *United States v. Peters*, 732 F.2d 1004, 1008 n.6 (1st Cir. 1984); *see United States v. Panhandle Trading, Inc.*, No. 5:05CR44 RSALL, 2006 WL 1883436, at *3 (N.D. Fla. July 7, 2006) ("A sole corporate agent cannot conspire with a corporation because a corporation has no mind of its own; the agent would, in effect, be conspiring with himself.").

Thus, Grimm's culpable mind cannot be used to make both him and his alleged principals (FGIC, Trinity, or Trinity Plus) members of the conspiracy.[12] For the same reason – even setting aside the fact that the government never

---

[12] When FGIC, Trinity, and Trinity Plus made interest payments within the limitations period supporting Counts 1 and 2, Grimm was the only alleged conspirator working at GE Capital.  Tr. 1527 (A671) (Goldberg left GE Capital in May 2001), 1619 (A692) (Carollo left GE Capital on approximately November 8, 2002).

adduced any evidence that Goldberg worked for (or was an agent of) the FSA entity that made the interest payments – Goldberg's culpable mind could not be used to make both him and any FSA entity members of the conspiracy. The government had a choice: it could have treated the interest-paying entities as members of the conspiracy based on their alleged association with the individual Defendants. But, having chosen instead to proceed directly against the individual Defendants on a conspiracy theory, the government cannot now seek to treat their alleged principals as *additional* members of the conspiracy simply to satisfy the statute of limitations' overt-act requirement.

### B. The Interest Payments Were Not Within The Scope Of The Conspiracy

A "crucial question in determining whether the statute of limitations has run is the scope of the conspiratorial agreement, for it is that which determines both the duration of the conspiracy, and whether the act relied on as an overt act may properly be regarded as in furtherance of the conspiracy." *Grunewald*, 353 U.S. at 397. The government charged and prosecuted this case as a conspiracy about obtaining GICs. The indictment alleges that Defendants engaged in "a scheme to deprive municipal issuers of money by causing them *to award* investment agreements and other municipal finance contracts at artificially determined or suppressed rates." Superseding Indictment ¶¶ 19, 27, 35, 44, 54, 61 (A179, A186, A193, A200, A206, A213) (emphasis added). The scope of the charged conspiracy

29

was therefore to obtain GICs.[13]  That process – winning the GIC and closing the

contract – occurred entirely *outside* the limitations period.

Despite the indictment's plain terms, the district court agreed with the

government that the "fraud ends not when the GIC is won or completed but when

the economic benefits of the fraudulent GIC [are] no longer *held* by the

conspirators."  Sentencing Tr. 11 (SPA21) (emphasis added).  That position not

only defies common sense, *see infra* pp. 32-34, but it impermissibly expanded

upon the actual charge in the indictment by holding that the charged scheme is not

merely to *obtain* awards and proceeds from GIC bids, but also to *hold and use* the

proceeds thus obtained by the payment of suppressed interest rates.  That

expansion violated Defendants' Fifth Amendment rights to be charged by a grand

jury indictment.  *See United States v. Hitt*, 249 F.3d 1010, 1015 (D.C. Cir. 2001)

("To determine the scope of the alleged conspiratorial agreement, the court is

bound by the language of the indictment.").  When, as here, "the proof adduced at

trial broadens the basis of conviction beyond that charged in the indictment," the

_____

[13] The evidence confirms that the agreement's scope was to win GICs.  *E.g.*, Tr. 339 (A382) (cooperating witness Doug Goldberg testifying:  "Generally we helped set up bids for specific providers, bidders to win either giving them information about other bidders' bids or giving them a last look or actually letting them reduce their bids.").  The interest payments required no additional cooperation or continuity of action from Defendants.  The payments were calculated and made automatically by computer, were supervised by employees who had no alleged involvement in the conspiracy, and were based on the terms set when the GICs were awarded.  Tr. 2743-47 (A938-39).

indictment has been constructively amended, requiring vacatur of the conviction.

*United States v. Roshko*, 969 F.2d 1, 5 (2d Cir. 1992) (internal quotations omitted);

*see also United States v. Bornman*, 559 F.3d 150, 153-54 (3d Cir. 2009).

### C.    The Interest Payments Were Not Overt Acts In Furtherance Of The Conspiracy, But Rather Were The Results Of An Already-Completed Conspiracy

An additional flaw in the theory underlying conviction is that the interest

payments did not qualify as overt acts in furtherance of the conspiracy because

they are merely the results of an already-completed conspiracy.

#### 1.    The interest payments were the results of a completed conspiracy

It is well-settled that, "[t]hough the *result* of a conspiracy may be

continuing, the conspiracy does not thereby become a continuing one.  Continuity

of action to produce the unlawful result, or . . . continuous co-operation of the

conspirators to keep it up[,] is necessary."  *Fiswick v. United States*, 329 U.S. 211,

216 (1946) (internal quotations and citation omitted; emphasis added); *see also*

*United States v. Kissel*, 218 U.S. 601, 607 (1910) ("the mere continuance of the

*result* of a crime does not continue the crime" of conspiracy; what continues the

crime is "continuous co-operation of the conspirators to keep it up") (emphasis

added).  The Supreme Court's explanation of the purpose of the overt-act

requirement – "to manifest that the conspiracy is at work" and is not "a fully

completed operation no longer in existence," *Yates*, 354 U.S. at 334 (internal

31

quotations omitted) – reflects the distinction between overt acts in furtherance of a continuing conspiracy and the results of a completed conspiracy.

      **a.**      Here, the interest payments on which the district court relied to extend the statute of limitations cannot be considered overt acts in furtherance of the conspiracy.  The trial evidence made plain that Defendants were convicted of conspiring to defraud municipalities by winning GIC auctions.  Once the GICs were awarded, the conspiracy was "a fully completed operation no longer in existence."  *Yates*, 354 U.S. at 334.  At that point, no "[c]ontinuity of action" or "continuous co-operation of the conspirators" occurred (or was necessary).  *Fiswick*, 329 U.S. at 216 (internal quotations omitted).  The extent of the economic benefit that the winning bidders derived from prevailing in the auction cannot be anything other than the "result" (*id.*) of the completed conspiracy.

      The court's contrary conclusion is unprecedented.  We are aware of no decision holding that a payment *to* the victim of a conspiracy constitutes a new overt act extending the limitations period.  *See infra* pp. 36-39 & note 16.  And upholding that proposition here would have breathtakingly broad consequences.  If the district court were correct that a conspiracy lasts as long as any conspirator engages in any act that manifests some economic benefit of the crime, then, in a conspiracy to rob a bank, the statute would not begin to run when the money is stolen, but rather when the conspirators spent all the money.  Under the district

court's logic, if the conspirators buried the money, the statute would not begin to run until the money was dug up and spent, even if decades elapsed. Extending statutes of limitations to cover realization of any economic benefit, as the district court did, would strip such statutes of all meaning.

The Fourth Circuit recognized that point in *United States v. Hare*, 618 F.2d 1085 (1980), where it explained that allowing "the term of [a] loan [to] determine the application of the statute of limitations . . . would be contrary to the Supreme Court's admonition . . . that federal statutes of limitations should be applied strictly in order to further the congressional policy favoring repose." *Id.* at 1086-87. There, the defendant was indicted under 18 U.S.C. § 201(g) (1982) – which prohibited a public official from receiving "anything of value" because of the performance of an official act – more than five years after he received a favorable loan. *See id.* at 1086. The court rejected the government's argument that the indictment was timely because the defendant continued to receive the economic benefits of the loan until it was fully repaid. *See id.* at 1087 ("the statutory period began running when the loan was received by the defendant," and "the statutory period did not begin to run anew each time the defendant made a payment subject to a favorable interest rate"); *cf. United States v. Colon-Munoz*, 192 F.3d 210, 229 (1st Cir. 1999) ("[t]o the extent that [defendant] continued in his efforts to

33

complete payment on the loan he had received [unlawfully] . . . , those were his acts alone and not part of the conspiracy").

**b.** Even if the interest payments here could be considered an "object" of the conspiracy (contrary to the indictment and trial record), that itself would not make those payments overt acts for limitations purposes. The First Circuit so held in *Doherty*. That case involved a conspiracy to steal advance copies of civil service examinations and sell them to policemen so they could obtain promotions. The court proceeded on the premise that "obtaining [an] increase in salary" from the promotions "was an object of the conspiracy." 867 F.2d at 61.

In addressing whether the receipt of those salary payments was an overt act, the court rejected an absolute rule "that a conspiracy stays in existence until its object is achieved." *Id.* Rather, the court explained that it was "reasonable to say that the act of receiving a conspiratorial objective is part of the conspiracy, where the receiving consists of one action, or a handful of actions, taking place over a limited period of time, or where some evidence exists that the special dangers attendant to conspiracies, the dangers of 'concerted' activity and 'group association' for criminal purposes, remain present until the payoff is received." *Id.* On the other hand, "where receiving the payoff merely consists of a lengthy, indefinite series of ordinary, typically noncriminal, unilateral actions, such as receiving salary payments, *and* there is no evidence that any concerted activity

posing the special societal dangers of conspiracy is still taking place, we do not see how one can reasonably say that the conspiracy continues." *Id.* "Rather, in these latter circumstances, one would ordinarily view the receipt of payments merely as the 'result' of the conspiracy." *Id.*

The First Circuit applied the *Doherty* test in *United States v. Nazzaro*, 889 F.2d 1158 (1989), a case involving the same conspiracy to obtain police promotion exams. The *Nazzaro* court explained the test as follows: in *Doherty*, "we developed a nearly disjunctive standard . . . : the 'payoff' should be considered as part and parcel of the conspiracy either where the receiving consists of one action or where some evidence exists that the special dangers attendant to conspiracies remain present until the payoff is received." *Id.* at 1163 (internal quotations and alterations omitted). Thus, where "an act which comprises a plausible objective of the conspiracy is discrete, unrepetitious, of limited duration, and requires the defendant's active participation – like a promotion – it can be considered as an overt act for limitation purposes, notwithstanding its ordinariness." *Id.* at 1164. However, where "an act or series of acts is determined to be lengthy and indefinite," "the import of ordinariness" – i.e., whether the activity is "ordinary" and "typically noncriminal" – "increases to a determinative level." *Id*. at 1163-64 (internal quotations omitted). The court explained that the "origins of this criterion" are that the "*Doherty* court wanted to avoid stripping statutes of

35

limitations of all meaning, a result that too easily could have occurred if each successive salary payment were to be considered an overt act for purposes of prosecuting a conspiracy charge." *Id.* at 1163.

Here, as in *Doherty*, the alleged overt acts – the interest payments – cannot be considered overt acts in furtherance of the conspiracy. The interest payments are not "one action" (or "a handful of actions"), but rather a "lengthy" and repetitious series of "ordinary," non-discretionary, "noncriminal," and "unilateral actions" made automatically pursuant to the terms set when the GICs were awarded. *Doherty*, 867 F.2d at 61. And no evidence reveals that the "special dangers" attendant to the conspiracy remained until the interest payments were made. *Id.* Rather, those dangers dissipated as soon as the GIC was won, because that is when the terms of the payments were set. The interest payments therefore were "merely . . . the 'result' of the conspiracy." *Id.*

### 2. The cases on which the district court and government relied in treating the interest payments as overt acts do not support that conclusion

In reaching its contrary conclusion that the interest payments were overt acts that extended the limitations period, the district court relied heavily on *Salmonese*, but that case is inapposite. There, the overt acts were "the conspirators' *receipt* of profits." 352 F.3d at 612, 616. To receive those profits, the conspirators had to engage in additional transactions – namely, sales of the securities whose value the

36

conspirators had fraudulently inflated through a "pump and dump" scheme. The charged scheme was not complete until the conspirators completed the dumping action for the warrants.

First, unlike *Salmonese*, the payments here did not flow from victims to conspirators. Second, the *Salmonese* Court expressly concluded that those sales constituted overt acts in furtherance of the conspiracy under the *Doherty* criteria, because the sales "were hardly 'indefinite' in number or 'lengthy' in duration" but instead occurred within weeks of the initial fraudulent conduct. *Id.* at 616. The court below placed much weight on *Salmonese*'s statement that, "where a conspiracy's purpose is economic enrichment, the jointly undertaken scheme continues through the conspirators' receipt of their anticipated economic benefits." *Id.* at 615 (internal quotations omitted). But *Salmonese* did not address a case, such as this one, where the alleged overt acts *are* "indefinite" in number and "lengthy" in duration, and therefore are nothing more than the results of a completed conspiracy.

In addition to *Salmonese*, the government has cited below several pre-*Doherty* cases for the proposition that "[c]onspiracies seeking economic gain by obtaining contracts do not end when the contracts are awarded, but continue as the conspirators make or receive payments under the contracts because those payments

are acts in furtherance of the conspiracy that realize the anticipated gain."  Bail

Opp. at 3.  But those cases are likewise different from this one, for several reasons.

*First*, in each of the government's cases, continuous cooperation among the

conspirators was necessary to receive the scheme's economic benefit, or the

scheme involved a time frame of short duration.[14]  *Doherty* expressly addressed

those cases and explained that, to give meaning to the statute of limitations, the

concept of an "overt act" cannot be extended to reach "a lengthy, indefinite series

---

[14] *See United States v. Dynalectric Co.*, 859 F.2d 1559, 1565 n.9 (11th Cir. 1988) (court found continued cooperation was needed until co-conspirator received its last payment); *United States v. Evans & Assocs. Constr. Co.*, 839 F.2d 656, 661 (10th Cir. 1988) (contract awarded in September 1979; payments to awardee were made only until 1981); *United States v. Northern Imp. Co.*, 814 F.2d 540, 541 (8th Cir. 1987) (bid-letting on contract in March 1980 with final payment on that contract just over one year later in July 1981); *United States v. A-A-A Elec. Co.*, 788 F.2d 242, 243, 245 (4th Cir. 1986) (bid for electrical construction work made June 25, 1979, contract awarded July 5, 1979, final payment on contract made in 1980, and winner paid off co-conspirators for participating in bid-rigging in May 1980, less than a year after bid was submitted; special dangers of conspiracy also continued through the payments because "the conspirators had to continue cooperating"); *United States v. Girard*, 744 F.2d 1170, 1171 (5th Cir. 1984) (contract signed in March 1977 and last payment made in June 1978; payments were made between co-conspirators until May 1978); *United States v. Mennuti*, 679 F.2d 1032, 1033, 1035 (2d Cir. 1982) (substantive mail fraud committed in December 1975 when insurance company issued check for a destroyed residence; payoff (Mennuti's bargain purchase of the property after the destruction, which was his sole reason for being in the scheme) occurred just over six months later in July 1976); *United States v. Walker*, 653 F.2d 1343, 1347-48 (9th Cir. 1981) (where Walker needed to use the proceeds from the scheme to pay his co-conspirators, the specials dangers attendant to conspiracy remained until those payments were made because, "[w]ithout the continuing cooperation of his co-conspirators, bought by the payoffs to them in various forms, the scheme would have fallen apart").

38

of ordinary, typically noncriminal, unilateral actions, such as receiving salary payments, *and* there is no evidence that any concerted activity posing the special societal dangers of conspiracy is still taking place." 867 F.2d at 61-62.[15]

*Second*, nearly all of the cases involved a conspirator *receiving* payments.[16] Here, by contrast, the interest-paying entities *made* payments *to* the alleged victims.

*Third*, several of the government's cases were brought under Sherman Act § 1, which does not have an overt-act requirement.[17] For conspiracy statutes that

---

[15] The government cited below only one post-*Doherty* case (other than *Salmonese*) on this point – *United States v. Anderson*, 326 F.3d 1319 (11th Cir. 2003). That decision is unpersuasive because the Eleventh Circuit erroneously distinguished *Doherty* on the ground that, in *Anderson*, the final payment under the contract "was part of the conspiracy to illegally obtain government funds under the contract." *Id.* at 1328. The same could have been said in *Doherty*; the First Circuit there proceeded on the premise that "obtaining th[e] increase in salary was an object of the conspiracy." 867 F.2d at 61. That a payment is asserted to be "an object of" or "part of" the conspiracy does not answer whether the payment "count[s] as an 'overt act' for statute of limitations purposes." *Id.*

[16] In *Walker*, the payments were made not to the alleged victim of the conspiracy, as here, but to other *co-conspirators* to ensure continued cooperation. Payments to other conspirators can be considered overt acts because, "[w]ithout the continuing cooperation of . . . co-conspirators, bought by the payoffs to them in various forms, the scheme would . . . fall[] apart." 653 F.2d at 1347-48. Although the government alleged that Defendants made swap-fee payments to co-conspirator brokers as corrupt "kickbacks" in furtherance of an illegal conspiracy to rig bids, the government adduced no evidence that any such payment was made within the statutory period.

[17] *See Dynalectric*, 859 F.2d 1559; *Evans & Assocs. Constr.*, 839 F.2d 656; *Northern Imp.*, 814 F.2d 540; *A-A-A Elec.*, 788 F.2d 242.

do not have an overt-act requirement, the conspiracy "'*is presumed to exist* until there has been an affirmative showing that it has been terminated.'" *Eppolito*, 543 F.3d at 48 (quoting *United States v. Spero*, 331 F.3d 57, 60 (2d Cir. 2003)) (emphasis added in *Spero*).

### D.    Treating The Interest Payments As Overt Acts Would Disserve The Policies Underlying The Statutes Of Limitations

Statutes of limitations "are vital to the welfare of society and are favored in the law." *Wood v. Carpenter*, 101 U.S. 135, 139 (1879). "They promote repose by giving security and stability to human affairs," and "[t]hey stimulate to activity and punish negligence." *Id.*; *see also Adams v. Woods*, 6 U.S. (2 Cranch) 336, 342 (1805) (Marshall, C.J.) (failing to apply statute of limitations "would be utterly repugnant to the genius of our laws").

Statutes of limitations serve particularly important goals in the criminal law. *See Bridges v. United States*, 346 U.S. 209, 215-16 (1953) (noting longstanding congressional policy of repose that is "fundamental to our society and our criminal law"). In the criminal context, statutes of limitations "protect individuals from having to defend themselves against charges when the basic facts may have become obscured by the passage of time," "minimize the danger of official punishment because of acts in the far-distant past," and "may also have the salutary effect of encouraging law enforcement officials promptly to investigate suspected criminal activity." *Toussie*, 397 U.S. at 114-15; *see also Eppolito*, 543 F.3d at 46

(citing *Toussie*).  Such statutes "protect defendants and the courts from having to

deal with cases in which the search for truth may be seriously impaired by the loss

of evidence, whether by death or disappearance of witnesses, fading memories,

disappearance of documents, or otherwise."  *United States v. Kubrick*, 444 U.S.

111, 117 (1979) (emphasis added); *see also id.* ("We should regard the plea of

limitations as a meritorious defense, in itself serving a public interest.") (internal

quotations omitted).

The Supreme Court has expressly stated that those important policies "guide

[its] decision" "[i]n deciding *when the statute of limitations begins to run* in a

given case."  *Toussie*, 397 U.S. at 114-15 (emphasis added).  Here, sanctioning a

rule that extends the limitations period until the last interest payment has been

made disserves the important purposes served by criminal statutes of limitations.

The interest payments are still being made (e.g., Tr. 2606 (A917)), and one GIC is

scheduled to pay interest until 2033 and another until 2034 (G-20-1, at 5 (A1376);

G-21-1, at 3 (A1383)); treating the payments as overt acts thus raises serious

concerns regarding stale evidence and unpredictability – precisely the concerns

against which statutes of limitations are supposed to guard.

Treating the interest payments as overt acts also undermines the policy of

"encouraging law enforcement officials promptly to investigate suspected criminal

activity."  *Toussie*, 397 U.S. at 115.  The government obtained its first cooperating

41

witness against Defendants in the spring of 2006.  Tr. 2262 (A842).  The

government searched one of the broker's offices later that year and developed three

more cooperating witnesses by mid-2007.  Tr. 336, 763, 771, 900, 999-1000

(A382, A482, A484, A515, A540).  Yet the first indictment in this case was not

filed until July 27, 2010.  The consequence of the government's delay should not

be an expansion of the limitations period that would vitiate the purposes that

statutes of limitations were intended to serve for both defendants and the judicial

system.

## II.    THE DISTRICT COURT MISINSTRUCTED THE JURY REGARDING THE OVERT-ACT REQUIREMENT

Even if the evidence could have supported a finding that the interest

payments were overt acts, a new trial would be required because the district court's

instructions did not require the jury to make that finding.[18]

The court charged the jury that an overt act "was 'in furtherance' of a

conspiracy if the act was undertaken in order to advance an objective of the

conspiracy."  Tr. 3235 (SPA17).  But, as Goldberg explained in his objection to

---

[18] This Court "review[s] *de novo* a claim of error in jury instructions." *United States v. Hassan*, 578 F.3d 108, 128 (2d Cir. 2008).  Although an appropriate jury instruction on the statute of limitations in a conspiracy case "may further complicate the already complex charge . . . , a requirement necessary to protect a defendant from over-extension of a legal doctrine may not be dispensed with simply because it somewhat lessens the attractiveness of prosecuting for conspiracy rather than for substantive crimes."  *United States v. Borelli*, 336 F.2d 376, 385 (2d Cir. 1964) (Friendly, J.).

that instruction, *see supra* p. 16, not every act furthering a conspiracy's objective qualifies as an overt act for limitations purposes. Routine acts that continue long after the commission of the underlying misconduct are "merely . . . the 'result' of the conspiracy" and thus do not "count as . . . 'overt act[s]' for statute of limitations purposes." *Doherty*, 867 F.2d at 61; *see supra* Part I.C. The court not only overruled Goldberg's objection but also erroneously rejected Defendants' proffered charge, which would have correctly explained to the jury that an overt act "require[s] the continuous cooperation of the alleged conspirators in order to be executed" or must be "accompanied by continued concerted activity and group association for criminal purposes by the alleged conspirators." Defs.' Proposed Supp. Charge at 2 (A361). If there is no such continuous activity, "and the act instead consisted of ordinary, typically non-criminal, unilateral actions, then the act is *not* in furtherance of an ongoing conspiracy and is merely the result of a completed conspiracy." *Id.*

The district court's denial of Goldberg's objection to the charge and the failure to give Defendants' proffered instruction are reversible errors. The government has not shown (nor could it) that "it is clear beyond a reasonable doubt" that a properly instructed jury would have found that an overt act in furtherance of the conspiracy occurred within the limitations period. *Hassan*, 578 F.3d at 129 (internal quotations omitted). The evidence showed that the interest

43

payments were a lengthy series of payments made automatically and unilaterally pursuant to terms set when the GICs were awarded. The jury, properly instructed, easily could have found that those payments were the completed *result* of the conspiracy, as opposed to an overt act in furtherance of the conspiracy. The instructional errors therefore were not harmless and a new trial is warranted. *See United States v. Fuchs*, 218 F.3d 957, 962 & n.1 (9th Cir. 2000) (setting aside conviction on plain-error review where court failed to provide statute-of-limitations instruction and it was "impossible to discern whether valid or invalid overt acts were relied upon by the jury in convicting the defendants") (citing *Yates*, 354 U.S. at 312).

## III.  THE DISTRICT COURT ERRONEOUSLY DENIED GOLDBERG A MISTRIAL AND MISINSTRUCTED THE JURY AFTER EXCLUDING SCOTT-JONES'S EVIDENCE

The court erred by denying Goldberg's mistrial motion after excluding the evidence admitted through Scott-Jones, including exculpatory tapes proving Goldberg's innocent intent. In vindicating Defendants' Confrontation Clause rights, the court denied Goldberg the right to present his defense. In addition, after an extraordinary series of events, the court provided an untimely, inadequate instruction to the jury regarding Scott-Jones's testimony and the evidence admitted though him.

**A.    The District Court Erroneously Denied Goldberg A Mistrial**

A district court should sever defendants indicted together "if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants." *Zafiro v. United States*, 506 U.S. 534, 539 (1993).  When Scott-Jones did not return to court to complete his cross-examination and the court struck all of the tapes introduced through him, continuing with a joint trial meant that Goldberg's trial right to present evidence of his defense was violated.

This Court has made clear that a defendant is entitled to present the central theory of his defense to the jury.  *See United States v. Reindeau*, 947 F.2d 32, 36 (2d Cir. 1991) (vacating conviction and remanding for new trial because "court's restriction of defendants' cross-examination impermissibly precluded the defendants from presenting their defense," which was not harmless error); *United States v. Kohan*, 806 F.2d 18, 22 (2d Cir. 1986) (reversing conviction because, "[w]hen an erroneous evidentiary ruling precludes or impairs the presentation of a defendant's sole means of defense, we are reluctant to deem it harmless"); *United States v. Harris*, 733 F.2d 994, 1005 (2d Cir. 1984) (reversing conviction and ordering new trial because court erroneously excluded evidence that "would have supported the main theory of the defense," rendering appellate court "'particularly reluctant to deem [the] error harmless'") (citation omitted).

In particular, this Court has overturned convictions when a defendant's right to present state-of-mind defenses has been violated. *See United States v. Biaggi*, 909 F.2d 662, 692 (2d Cir. 1990) (vacating counts of conviction because of exclusion of "consciousness of innocence" evidence and noting that, "[w]here evidence of a defendant's innocent state of mind, critical to a fair adjudication of criminal charges, is excluded, we have not hesitated to order a new trial"); *United States v. Detrich*, 865 F.2d 17, 21 (2d Cir. 1988) (reversing conviction and ordering new trial because of erroneous exclusion of evidence that "might have enhanced appellant's credibility on the crucial issue of his *mens rea*").

Goldberg was entitled to present the evidence excluded by the court both because it was central to his defense and because that defense went to his state of mind. Goldberg's state of mind was "the primary part" of his defense to all of the government's charges. Tr. 2707 (SPA13). In every count that went to the jury, the government was required to prove that Goldberg acted willfully: "with the intent to do something the law forbids; that is to say, with bad purpose either to disobey or to disregard the law." Tr. 3229 (A1028) (instructions to jury); *see also* Tr. 3231 (A1028). Accordingly, in every count, the government argued that Defendants made swap-fee payments to the brokers as corrupt "kickbacks" in furtherance of an

illegal conspiracy to rig bids.[19]  Goldberg's defense opened and closed on the

theory that Defendants made those swap-fee payments not to further a bid-rigging

conspiracy, but with the innocent intent of rewarding the brokers for permissible

favors.  *E.g.*, Tr. 275, 289, 3034, 3147, 3152 (A373, A376, A978, A1006-07)

(defendant opening statements and summation).  The government itself recognized

in its summation that intent was Defendants' central theory:  "[L]et's turn to the

core issue in this case.  The main question for you is simple:  Did the defendants

knowingly and intentionally participate in these frauds?"  Tr. 2983 (A965).

        The evidence admitted through Scott-Jones was highly probative of

Goldberg's state of mind in all four conspiracies charged against him.  Goldberg

offered tapes during the Scott-Jones cross-examination showing that Goldberg

made payments to Scott-Jones in exchange for Scott-Jones's legitimate

introductions of Goldberg to new GIC issuers, not with an intent to defraud.  On

one excluded tape, Scott-Jones told Goldberg that there would be no connection

between Scott-Jones making a referral and GE winning a bid.[20]  On another

---

[19] *E.g.*, Tr. 234, 247-48, 252, 2977-79, 2982-88, 2991, 2994, 2996, 2998-3002, 3005-09, 3011, 3020, 3024 (A368, A370-72, A964-72, A974-75) (references to "kickbacks" in government's opening and summation).

[20] Goldberg said:  "[W]hat you're providing is, ah, getting us into the client . . . and having us approved to do business . . . [a]nd whatever happens from there, happens."  SGX-146399, at 2 (A1572).  Scott-Jones said on tape that there had to be "a Chinese Wall between . . . client and whatever happens.  I mean, you can't say, 'Hey, you know, we're going to bring you xyz' and you win."  *Id.*

excluded tape, Scott-Jones told Goldberg that he could introduce GE to new issuers but could not guarantee that GE would win bids.[21]  On another tape, Goldberg told Scott-Jones that he needed to figure out how much Scott-Jones should be paid for helping Goldberg get approved to bid on – but not necessarily win – GICs from certain municipal issuers.[22]  And, on two other excluded tapes, Defendants' offers to pay Scott-Jones (or his partner) were in connection with introductions where Scott-Jones was not even the broker on the deal and thus could not engage in bidding malfeasance.[23]  All of these excluded tapes show that Goldberg was paying for legitimate introductions, and not something unlawful related to the bidding.

---

[21] Scott-Jones said:  "All we can do is open doors.  We can make the introductions, but we can't guarantee anything after that. . . . I mean, but anything further than that, I can't, we can't do that. . . . Yeah.  We, we'll make the introductions and you, you take it from there."  SGX-146403, at 1-2 (A1576-77).

[22] Goldberg said:  "I have to figure out for – How much is, you know, getting signed up for Massachusetts, which I was able to win a deal. . . . And possibly another deal.  And other guys that you're gonna sign me up with . . . and other potential business.  How much is that worth to, uh, to FGIC . . . ."  G-130518, at 3 (A1129).

[23] On one occasion, Scott-Jones talked with Goldberg and Carollo about a GIC being offered by another broker.  Scott-Jones said:  "[I]f you haven't seen it, I will make sure that you get on the bidding list."  Scott-Jones noted he was not the broker on the deal and that the issuer was going to "send it out direct unless it will be another broker."  Carollo thanked Scott-Jones and offered:  "Maybe we'll do – if we can win it – maybe we can do a swap with you on something, right? . . . Listen, Adrian, I really appreciate you giving us a head's up on this stuff.  That's really good of you."  SGX-578837, at 1-2 (A1628-29).

On the other transaction in which Scott-Jones was not the broker, *see* Tr. 1943 (A772), Goldberg suggested that if "he [Scott-Jones's partner] knows who the players are . . . and he could get me, you know, at least get my document

48

Moreover, on other excluded tapes, Goldberg demonstrated his belief that paying brokers was legal and something that could be arranged in the open. The excluded tapes showed that Goldberg involved in-house lawyers with the drafting and negotiation of a proposed consulting agreement under which Scott-Jones would be paid for making introductions. Tr. 1722-23, 1964-67 (A718, A777-78); SGX-147696, at 4 (A1599); SGX-147589, at 4 (A1594). The excluded tapes showed that Goldberg and others at GE told Scott-Jones that the version of the consulting agreement proposed by Goldberg and GE contained a provision calling for the agreement to be disclosed to Scott-Jones's municipal clients. Tr. 1976, 1987-88 (A780, A783); SGX-148813, at 1-2 (A1610-11); SGX-602370, at 3-4 (A1640-41).[24] On another excluded tape, when discussing the possibility of paying Scott-Jones via a swap fee, Goldberg exhibited his innocent intent when he asked

---

approved and help me with, you know, the bond counsel, whatever, to make sure I'm part of the bid . . . you know, bid it, and, you know . . . sure I can pay you." SGX-603652, at 1 (A1645). At trial, Scott-Jones conceded that, on this tape, he understood Goldberg "to be saying that he could pay [Scott-Jones] for the reference of new business that [Scott-Jones] did not broker." Tr. 1943 (A772).

[24] On SGX-148813, Goldberg said: "So if you go into, you know, Joe Schmoe, uh, municipality and say, you know, 'We'd like to get Trinity signed up,' and you're gonna – you've got to tell them that we, you know, you're working as a consultant for us." *Id.* at 2 (A1611). On SGX-602370, Goldberg said: "If you're going to disclose it, then that's one thing, but if you're not, then we shouldn't do it. . . . You know if you want to be in the business 10 years from now then we should do it the right way." *Id.* at 3-4 (A1640-41).

Scott-Jones, "[W]hat would be so bad about . . . anybody knowing about you arranging swaps for me?"  SGX-146966, at 5 (A1586).

Those excluded Scott-Jones tapes demonstrate Goldberg's innocent purpose for paying the brokers in all of the conspiracies.  Goldberg's intent when paying Scott-Jones in the alleged Count 3 conspiracy was relevant to his intent when paying CDR and IMAGE in the Counts 1, 2, 5, and 6 conspiracies because the payments to Scott-Jones were the original pattern that he followed for the other broker relationships.[25]  Indeed, the prosecution argued in summation that the scheme stayed the same across counts.  Tr. 2982-83 (A965) (referring to the respective GE and FSA schemes with CDR in Counts 1 and 5 as "new company, the same scheme"), 3016 (A973) (referring to the GE schemes with CDR and IMAGE in Counts 1 and 2, respectively, as "[s]ame scheme, different broker").  The government conceded that Goldberg's intent with respect to one broker was relevant to his intent with respect to others:  its summation prominently featured a

---

[25] It is undisputed that Goldberg first started paying Scott-Jones, and only subsequently paid IMAGE and CDR.  The negotiations with Scott-Jones about being paid occurred in August or September 1999, and continued through January 2000.  *See* Tr. 1697-99, 1955 (A711-12, A775).  By contrast, the government's own evidence showed that the first discussions about paying IMAGE occurred on May 23, 2000.  Tr. 2519-20 (A907) (discussing G-596159).  Similarly, the first time Defendants discussed paying CDR via swap fee was in March 2001 – months after the first swap fee paid to Scott-Jones.  Tr. 398-402 (A397-98) (CDR witness Doug Goldberg's testimony that, prior to Allegheny deal, he had no knowledge of any payment agreement between CDR and Steve Goldberg).

50

tape between Defendants and a non-conspirator broker simply so the government

could argue that Goldberg's intent when he paid that broker informed his intent

when he paid CDR and IMAGE.  Tr. 2978-79 (A964).

Once the court decided, over Goldberg's objection, to exclude all evidence

introduced through Scott-Jones to protect Defendants' Confrontation Clause rights,

the only available option was to grant Goldberg a mistrial.  *See United States v.*

*Seifert*, 648 F.2d 557, 563 (9th Cir. 1980) (holding defendant-appellant entitled to

severance at close of government's case when co-defendant announced, contrary to

prior assurances, that he would not testify and thus would not provide exculpatory

evidence anticipated by defendant-appellant); *United States v. Sampol*, 636 F.2d

621, 650-51 (D.C. Cir. 1980) (per curiam) ("The joint trial of Ignacio and

Guillermo impeded presentation of this feature of Ignacio's defense on a key

element of one of the crimes charged, and we consider this as additional support

for the conclusion that severance of Ignacio's trial was necessary in these

circumstances.").

This case is analogous to the many cases in which a conflict between co-

defendants' rights under *Bruton v. United States*, 391 U.S. 123 (1968), arises mid-

trial.  There, one defendant's statement implicating another is introduced, and the

implicated defendant's right to cross-examine his accuser cannot be reconciled

with the declarant defendant's right to remain silent.  *See United States v. Lee*, 549

51

F.3d 84, 92 (2d Cir. 2008); *Howard v. Walker*, 406 F.3d 114, 129 (2d Cir. 2005);

*Ryan v. Miller*, 303 F.3d 231, 251 (2d Cir. 2002); *Holland v. Scully*, 797 F.2d 57,

59 (2d Cir. 1986); *United States v. Danzey*, 594 F.2d 905, 917-19 (2d Cir. 1979);

*United States v. Gonzalez*, 555 F.2d 308, 317 (2d Cir. 1977).

Here, Goldberg's right to present his critical *mens rea* defense could not be

reconciled with Defendants' rights to confront their accuser.  Because the court

chose to vindicate the latter at the expense of the former, it should have granted

Goldberg's motion for a mistrial.

### B.    The Curative Instruction Was Untimely And Insufficient

The government's conduct in this case led the district court into error,

causing the court to delay giving curative instructions and to give instructions that

were inadequate to cure the unique prejudice that had been occasioned by Scott-

Jones's testimony and the exhibits introduced through him.

On April 26, Scott-Jones falsely testified on cross-examination that the

government had not prepared him to testify.  Tr. 2057 (A801).[26]  The government

knew at the time that this testimony was false.  In an improper speaking objection,

the government coached the witness to "clarify" his answer.  Tr. 2057-58 (A801).

Rather than concede to the jury and the court that its witness committed perjury,

---

[26] Scott-Jones admitted the following day under continued cross-examination that he had lied, and the court found that he had committed perjury. Tr. 2085, 2693 (A808, SPA10).

the government suggested to the court that the falsehoods might have been unintentional.  The government first said that Scott-Jones was "tired and confused," Tr. 2069 (A804), and then suggested the "difference between U.K. English and American English" may have resulted in miscommunication, Tr. 2072 (A805), even though Scott-Jones had been in the United States for more than 25 years, Tr. 1685, 2073 (A708, A805).  The government initially resisted a curative instruction regarding Scott-Jones's perjury and, instead, insisted that cross-examination should continue.  Tr. 2071 (A805).  The court noted that, by putting Scott-Jones on the stand, the government vouched for his credibility.  Tr. 2077, 2080 (A806-07).  The government's positions were particularly egregious because, unknown to Defendants, prior to his direct examination Scott-Jones had asked one of his FBI-agent handlers whether, if asked on cross-examination, he should deny having been prepared to testify by the government.[27]

Next, when it became clear that Scott-Jones had attempted suicide and could not return to complete his cross-examination, the government still sought to preserve Count 3 and to offer another recording in support of it.  *See* Letter from A. Hill to Hon. H. Baer (Apr. 29, 2012) (A340-44); Tr. 2822-23 (A954).  The government provided no guidance to the court on the Confrontation Clause issues

---

[27] *See* Letter from A. Hill et al. to Hon. H. Baer 1-2 (Apr. 26, 2012) (A329-30).

caused by Scott-Jones's disappearance until two days after it knew he had attempted suicide.  *See* Letter from A. Hill to Hon. H. Baer (Apr. 29, 2012) (A340-44)*.*  The government's conduct led the court into error, causing it to delay giving curative instructions and to give instructions that were inadequate to cure the prejudice that had been occasioned by Scott-Jones's testimony and the exhibits introduced through him.

The Scott-Jones testimony was pivotal to the government's case because he testified about the supposed formation of a conspiratorial agreement, interpreted tapes containing innocent conversation as evidence of a scheme to defraud, and asserted that he had incriminating conversations with Goldberg and Carollo that were not recorded.  Tr. 2134 (A820).

The government's conduct led the court to allow the jury to believe, for days after the testimony and the witness's disappearance, that the testimony would be considered.  On April 30, the Monday after the perjury and when the court knew Scott-Jones would not be returning, the court told the jury that, "when you consider his testimony, you will have to consider it with a lot of cautions that I will regale you with at the time of my charge."  Tr. 2316 (SPA8).  The court instructed the jury to disregard that testimony only at the end of the day on May 1 – eight days after the testimony started, five days after Scott-Jones's perjury, and four days after

the witness disappeared.  For eight days, the jury was permitted to believe that Scott-Jones's testimony should be credited.

The court's delay in instructing the jury to disregard the extensive Scott-Jones testimony, combined with the government's comments, created a situation that was so prejudicial that the instruction could not remove the taint from the jurors' minds.  *See*, *e.g.*, *United States v. Carroll*, 26 F.3d 1380, 1389 (6th Cir. 1994) (ordering new trial where court failed "to give a prompt and appropriate curative instruction" after government vouched for its witnesses); *United States v. Solivan*, 937 F.2d 1146, 1157 (6th Cir. 1991) (ruling that court's instruction was "too late to eradicate the prejudice" after 20-minute delay allowed prosecutor's improper comments to become "'etched in granite' in the jurors' minds"); *United States v. Gullo*, 502 F.2d 759, 762 (3d Cir. 1974) (noting that "[w]hatever efficacy curative instructions possess cannot help but be weakened by the lapse of time" and ruling that 24-hour delay after prosecutor's improper question, combined with other factors, resulted in unfair trial); *United States v. Garber*, 471 F.2d 212, 217 (5th Cir. 1972) (concluding that court's instruction was "too little and too late" to cure prejudice effectively).

Striking Count 3 did not remedy the deficiency in the court's response to these extraordinary events.  The jury's deliberations on other counts were also

55

infected by the 134 government-offered tapes it heard through Scott-Jones.[28]  The

court never instructed the jury to disregard the tapes.  This error was occasioned by

the government's attempt to convince the court that these tapes should remain

before the jury when it argued that Count 3 should not be dismissed.[29]

Meanwhile, the court ordered the defense not to refer to the Scott-Jones

tapes in any fashion.  Tr. 2702 (SPA12).  Scott-Jones's extensive interpretations of

government tapes over four days created the danger that jurors relied on those

tapes in deliberating on other counts, particularly in the absence of an instruction to

disregard them and the inability of defense counsel to address them.

Moreover, the delay in striking the testimony permitted the jury to treat

Scott-Jones as corroboration of the prior government witness, Stewart Wolmark,

who was the only other witness to testify to untaped conversations in which

Goldberg supposedly agreed that swap fees would be kickbacks for last looks.  Tr.

1652 (A700).  The harm was exacerbated because Defendants could not complete

cross-examination to discredit Scott-Jones's interpretation of the government-

introduced tapes.

---

[28] For example, the government offered G-130518, a tape where Goldberg
and Scott-Jones discussed GE paying Scott-Jones a fee in exchange for
introductions.  Scott-Jones testified on direct that this fee arrangement was just
"smoke and mirrors" to hide the fact that Goldberg intended to pay Scott-Jones a
bribe to get a last look.  Tr. 1722 (A718).

[29] *See* Letter from A. Hill to Hon H. Baer (Apr. 29, 2012) (A340-44).

## IV.    THE EVIDENCE WAS INSUFFICIENT TO ESTABLISH A WIRE-FRAUD CONSPIRACY

The government charged that the conspiracy "depriv[ed] the municipal issuers of the *property right* to control their assets by causing them to make economic decisions based on false and misleading information."  Superseding Indictment ¶¶ 19, 27, 35, 44, 54, 61 (A179, A186, A193, A200, A206-07, A213) (emphasis added); *see also* Tr. 3224 (A1026) (district court instructing jury on "right to control" theory).  In this Circuit, the right to control one's assets has been held to be "property" under the mail- and wire-fraud statutes.  *See*, *e.g.*, *United States v. Carlo*, 507 F.3d 799, 801-02 (2d Cir. 2007) (per curiam).  But that position is incorrect and conflicts with the law in other circuits that have held that the right to control one's assets does not constitute "property" under those statutes.  *See United States v. Lewis*, 67 F.3d 225, 233 (9th Cir. 1995); *United States v. Zauber*, 857 F.2d 137, 146-47 (3d Cir. 1988).[30]

---

[30] That the district court instructed the jury on alternative theories, *see* Tr. 3224 (A1026), does not save the convictions, because, if the court instructs the jury on alternative theories, one of which is legally invalid, a general verdict of guilty cannot stand unless the error is harmless.  *See*, *e.g.*, *Skilling v. United States*, 130 S. Ct. 2896, 2934 (2010); *United States v. Szur*, 289 F.3d 200, 208 (2d Cir. 2002). The government has not argued that the court's error was harmless.

## V.    GOLDBERG JOINS IN THE ARGUMENTS OF CAROLLO AND GRIMM

To the extent applicable to the judgment against him, Goldberg also joins in

the arguments set forth in the briefs of defendant-appellants Carollo and Grimm.

*See* Fed. R. App. P. 28(i).

## CONCLUSION

The judgment of the district court should be reversed.

Respectfully submitted,

 /s/ *David C. Frederick*

| | |
|---|---|
| JOHN S. SIFFERT | DAVID C. FREDERICK |
| DANIEL M. GITNER | BRENDAN J. CRIMMINS |
| LANKLER SIFFERT & WOHL LLP | EMILY T.P. ROSEN |
| 500 Fifth Avenue | ANDREW E. GOLDSMITH |
| New York, New York 10110 | KELLOGG, HUBER, HANSEN, TODD, |
| (212) 921-8399 | EVANS & FIGEL, P.L.L.C. |
| | 1615 M Street, N.W., Suite 400 |
| | Washington, D.C. 20036 |
| | (202) 326-7900 |
| | (202) 326-7999 (facsimile) |

*Attorneys for Defendant-Appellant Steven E. Goldberg*

June 28, 2013

58

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C), the undersigned certifies that this brief complies with the applicable type-volume limitations.  This brief was prepared using a proportionally spaced type (Times New Roman, 14 point).  Exclusive of the portions exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii), this brief contains 13,805 words.  This certificate was prepared in reliance on the word-count function of the word-processing system (Microsoft Word 2007) used to prepare this brief.

/s/ *David C. Frederick*
David C. Frederick

June 28, 2013

# CERTIFICATE OF SERVICE

I hereby certify that, on June 28, 2013, I electronically filed the foregoing Final Brief of Appellant Steven E. Goldberg with the Clerk of the Court for the United States Court of Appeals for the Second Circuit by using the appellate CM/ECF system.  All participants are registered CM/ECF users and will be served by the appellate CM/ECF system.


/s/ *David C. Frederick*
David C. Frederick